**Daniel Joseph ALDERMAN, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

**No. 95–70609.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1996.

Decided Jan. 8, 1997.

Allan A. Fulsher, Beaverton, OR, for petitioner.

Randall W. Quinn, Securities and Exchange Commission, Washington, D.C., for respondent.

Before: CANBY, RYMER, and KLEINFELD, Circuit Judges.

RYMER, Circuit Judge:

Daniel Alderman seeks review of an order of the Securities and Exchange Commission that affirmed a disciplinary action against him by the National Association of Securities Dealers, Inc. Alderman was an associated person of American Interstate Financial Corp. (AIFC), an NASD member broker/dealer, and was an officer of AIFC's parent company, Peregrine Holdings, Ltd. He was disciplined for violating Article III, Section 1 of the NASD Rules of Fair Practice by failing promptly to return AIFC client funds that ended up in Peregrine's account. Alderman contends that the NASD Rule is too vague to be applied to him (and correspondingly, that the SEC and NASD lacked jurisdiction to discipline him) because the failure to reimburse funds occurred in Alderman's capacity as an officer of a non-NASD member company and did not arise from the

conduct of the business of AIFC, the member firm. We agree with the SEC that wrongfully withholding funds on Peregrine's behalf that belonged to clients of AIFC, an NASD member firm of which Alderman was a director and control person, was inconsistent with his obligations on behalf of AIFC. As we have jurisdiction, 15 U.S.C. § 78y(a)(1), we uphold the Commission's order.

## I

During 1992, Alderman was a director and the corporate secretary of AIFC, a broker/dealer registered with the NASD, and a director and vice president of AIFC's parent company, Peregrine. Alderman was a "control person" of both AIFC and Peregrine. Peregrine was not itself an NASD member, but it was, in turn, a control person of AIFC.[1] AIFC and Peregrine operated from the same offices in Portland, Oregon.

Because AIFC was not licensed to hold client funds, it cleared its securities trades through another, unrelated company, Emmett A. Larkin Co. AIFC maintained trading accounts with Larkin for Peregrine and for other AIFC customers. It is undisputed that on July 24, 1992 Larkin accidentally credited Peregrine's AIFC trading account with $3,193.23 that should have gone into the account of AIFC's customers Joseph and Sylvia Sacca. In a routine "sweep" of the cash balance in its trading account, Peregrine transferred the mistaken deposit into its account at Bank of America. In late August 1992, Clarissa O'Hanley, Peregrine's vice president of finance and administration, discovered the error. She learned from AIFC's compliance officer that the money had come from the Saccas' account, so she transferred $3,193.23 out of Peregrine's money market

account at Larkin into accounts payable. On September 10 or 11, 1992, O'Hanley drafted a check payable to the Saccas for $3,206.06 which she signed and presented to Alderman for his review and signature. She explained to him what had happened; Alderman signed the check, but did not authorize its release. (Peregrine checks were not being released during this time frame without Alderman's authorization because of the company's cash flow problems.) That check was voided October 31, but restitution, with interest, was made to the Saccas November 2 and 3, 1992, after an NASD auditor questioned the failure to reimburse.

In October 1993, the NASD initiated complaint proceedings charging that Alderman knowingly failed to permit Peregrine to reimburse the Saccas, which constituted misuse of customer funds in violation of Article III, Section 1 of the NASD Rules of Fair Practice.[2] A hearing was held before the NASD's District Business Conduct Committee for District No. 3 in March 1994.

The DBCC issued a decision finding Alderman liable for the violation charged, censuring him for violating the Rules and fining him $3,000 plus litigation costs of about $1,600. The NASD's National Business Conduct Committee affirmed the DBCC's finding of violation and sustained the sanctions. After a de novo review of the record, the SEC found that Alderman deliberately withheld payment to the Saccas for over two months, and concluded that this violated his duty under Article III, Section 1, as an associated person of AIFC, to adhere to high standards of commercial honor and just and equitable principles of trade in conducting AIFC's business.[3] *Daniel Joseph Alderman*, 59 S.E.C. Docket 2075 (1995), 1995 WL 442069

---

1. NASD registration form BD defines a control person as a person "with the power, directly or indirectly, to direct the management or policies of a company. Any person that (1) is a director ... or officer exercising executive responsibility (or having similar status or functions) ... is presumed to control that company."

2. Article III, Section 1 states: "A member, in the conduct of his business, must observe high standards of commercial honor and just and equitable principles of trade." NASD Manual ¶ 2151.

Article I, Section 5(a) of the Rules provides: "Persons associated with a member shall have the same duties and obligations as a member under these Rules of Fair Practice." *Id.* ¶ 2005. Alderman stipulated that he is an associated person of AIFC.

3. The SEC has jurisdiction to review and enforce NASD disciplinary actions under the Maloney Act, 15 U.S.C. § 78s(d).

(S.E.C.) *1, *2. The Commission also upheld the fine.

Alderman has timely sought review.

## II

■ We review the Commission's factual findings for substantial evidence, 15 U.S.C. § 78y(a)(4), which means that we weigh pros and cons in the whole record with a deferential eye. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Howard v. FAA*, 17 F.3d 1213, 1216 (9th Cir.1994). If the evidence is open to more than one interpretation, we must uphold the Commission's findings. *Davy v. SEC*, 792 F.2d 1418, 1421 (9th Cir. 1986). We will defer to an agency's construction of its own regulations except where the interpretation is "unreasonable" or "plainly erroneous." *Lambert v. FDIC*, 847 F.2d 604, 606 (9th Cir.1988). We review the SEC's affirmance of the NASD's imposition of sanctions for abuse of discretion. *Carter v. SEC*, 726 F.2d 472, 474 (9th Cir.1983).

## III

■ Alderman takes issue with many of the findings of fact made by the DBCC and the SEC, but they are supported by substantial evidence.[4] His more forceful arguments are that Article III, Section 1 of the Rules is void for vagueness in its application to him, and that the NASD lacked jurisdiction since his failure to act did not arise from the

conduct of business by a member firm. Alderman also contends that the SEC's order is an unconstitutional attempt to preempt state law regarding the internal governance of a private, non-member corporation organized under state law, and that he did not violate Article III, Section 1.

### A

Although differently articulated, each of these submissions turns on Alderman's view that NASD sanctions may not be imposed on him because he allegedly failed to act in his capacity as an officer of a private, non-regulated corporation. Alderman was, of course, wearing two hats, but both the DBCC and the SEC found that he was in a position at Peregrine to delay reimbursement of funds that he knew belonged to AIFC clients. There is no question that Alderman had a duty as an associated person of AIFC to act in accordance with NASD ethical standards toward AIFC customers. This duty was his, not Peregrine's, and he didn't lose it simply because he also had (unregulated) responsibilities at Peregrine. When he acted to hold up reimbursement of the Saccas' money, albeit with his Peregrine hat on, Alderman knew that he was preventing the return of money belonging to his regulated firm's clients. As security of client funds was part and parcel of Alderman's AIFC business, his conduct with respect to those funds was appropriately subject to NASD regulation. For these reasons, applying Article III, Sec-

4. We do not dwell on these points, as they basically turn on O'Hanley's credibility. An initial factfinder's assessments of credibility deserve "special weight." *Bosma v. United States Dep't of Agric.*, 754 F.2d 804, 808 (9th Cir.1984). Ample evidence supports O'Hanley's version of events: the record reflects that AIFC was experiencing cash flow problems, and that many bills were being left unpaid in this period. O'Hanley's termination agreement with Peregrine states that she had not been authorized to release checks without prior approval. Alderman conceded that he conferred with O'Hanley about what expenses she was paying and when. O'Hanley testified that she went over all unusual payments with Alderman and that she "explained to him that these were customer funds and that we needed to pay it back." A co-worker testified that O'Hanley kept Peregrine's cash accounting up to date.

Alderman's argument that the DBCC and the Commission failed to consider O'Hanley's motives to lie about him, including the fact that she might have been sanctioned if the Sacca matter were her fault, is misplaced because the Commission expressly noted that O'Hanley might have sought to blame Alderman to avoid censure, but concluded that "we have no reason to believe" that the DBCC failed to take that into account. 1995 WL 442069, at *1 n. 6.

Nor do we agree with Alderman's suggestion that the DBCC's credibility findings are undermined because O'Hanley testified at the hearing by telephone. See *Official Airline Guides, Inc. v. Churchfield Publications, Inc.*, 756 F.Supp. 1393 (D.Or.1990) (relying on telephonic testimony), *aff'd*, 6 F.3d 1385 (9th Cir.1993). As we have indicated, it is obvious to us from the transcript, as it was to the SEC, that substantial evidence supports O'Hanley's version of her role and Alderman's conduct.

tion 1 to him as a control person of AIFC cannot have come as a surprise. We therefore reject Alderman's vagueness challenge as applied, *see Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857–58, 100 L.Ed.2d 372 (1988) (noting that objections to vagueness under the Due Process Clause rest on lack of notice and may be overcome in any specific case where reasonable persons would know their conduct is at risk),[5] and we hold that his refusal promptly to reimburse clients of his NASD member firm was sufficiently related to the business of AIFC to fall within the jurisdiction of the NASD.

**B**

■ Retaining the same underpinnings but changing the focus somewhat, Alderman maintains that the SEC's order impinged on the State of Oregon's power to create corporations and to govern their internal affairs because he had no corporate authority or duty to send a check to Larkin, and that to hold otherwise has the effect of preempting Oregon law. While it is true, as Alderman argues, relying on *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), that corporations such as Peregrine are creatures of state law, neither the NASD nor the SEC acted against Peregrine at all, let alone subjected Peregrine or any of its non-regulated personnel to the NASD Rules. Alderman does not claim that state law required him to withhold the Saccas' money, or that complying with the NASD standards was inconsistent with any duty he had to Peregrine under state law: after all, the funds did not belong to Peregrine in the first place. Therefore, his contention that the NASD somehow preempted Oregon law has no merit.

**C**

■ Alderman also contends that even if he had a duty to act and failed to do so, his failure would not violate Article III, Section 1 since neither he nor AIFC authorized or requested the erroneous transfer by Larkin. We are unpersuaded, given that the Commission found that Alderman acted affirmatively to withhold authority to return the Saccas' funds knowing that the monies needed to be returned, and it concluded that in this, he acted "at least unethically." 1995 WL 442069, at *2.

**IV**

■ Alderman argues that the Commission abused its discretion by upholding the censure and $3,000 fine. However, the NASD's Sanction Guidelines recommend a fine of between $2,500 and $20,000 for misuse of customer funds not rising to conversion. Assuming that Alderman did not waive this argument by failing to include it among the issues presented for review, F.R.A.P. 28(a)(3), the fine here is at the low end of the range, and Alderman was not barred from the securities business for any length of time, although the Commission found that withholding customer funds is a serious offense. We see no basis for overturning the sanctions.

PETITION DENIED.

---

5. The government suggests that a lesser standard is appropriate with respect to regulatory statutes, but we do not decide this question here because Article III, Section 1 passes even the criminal test as applied to Alderman. We do, however, note that Alderman's reliance on *United States v. Wunsch,* 54 F.3d 579 (9th Cir.1995), *superseded,* 84 F.3d 1110 (9th Cir.1996), and *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), is misplaced because both cases involved First Amendment challenges in which the vagueness standard is "more strictly applied" than in other contexts. *Wunsch,* 54 F.3d at 586. In any event, where First Amendment issues are not implicated, a vagueness challenge is undertaken only as applied to the facts of a particular case. *See United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *see also Sorrell v. SEC,* 679 F.2d 1323, 1326 (9th Cir.1982) (evaluating vagueness claim in context of violation of NASD Article III, Section 1 and concluding that broker had adequate notice that violation of the securities laws would also violate Section 1).