Kenneth Craig KRULL, Petitioner,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

No. 99–70290.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 12, 2001

Filed April 26, 2001

Frederick Davis Huebner, Cable, Langenbach, Kinerk & Bauer, LLP, Seattle, Washington, for the petitioner-appellant.

Allan A. Capute, Securities and Exchange Commission, Washington, D.C., for the respondent-appellee.

Before: McKEOWN, WILLIAM A. FLETCHER, RAWLINSON, Circuit Judges.

McKEOWN, Circuit Judge:

The outcome of this appeal from a disciplinary action involving a registered securities representative rests in large part on the standard of review. The National Association of Securities Dealers found violations of its Rules of Fair Practice regarding unsuitable switches in mutual fund investments and imposed a disciplinary sanction on a registered securities representative. The Securities and Exchange Commission independently reviewed the record, upheld the finding of violations, and modified the sanction. After a multi-step review process, the scope of our review is limited. We affirm the Securities and Exchange Commission be-

cause substantial evidence supports the findings and the sanction is not "unwarranted in law or [ ] without justification in fact." *Sartain v. SEC*, 601 F.2d 1366, 1374 (9th Cir.1979) (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 112–13, 67 S.Ct. 133, 91 L.Ed. 103 (1946)).

## I. BACKGROUND

### A. THE TRANSACTIONS

Kenneth C. Krull became a registered securities representative in 1981. At the time of the transactions at issue, Krull was a general securities principal, branch manager, and sole registered representative in the Marysville, Washington office of Investment Management and Research, Inc. Investment Management is a member firm of the National Association of Securities Dealers, Inc. ("NASD").

From November 1990 through July 1993, Krull repeatedly switched eight customers, holding ten accounts, in and out of a series of common stock mutual funds. With one exception, these funds were front-end "loaded"; that is, they charged a transaction fee at the time of purchase. The remaining fund was subject to a contingent deferred sales charge if sold within a six-year holding period. Krull recommended all of the more than one hundred transactions in question to customers who invariably heeded his advice. Customers held the mutual funds on average for just over ten months. Although the customers consented to each transaction by signing a "switch form," Krull failed to follow company policy to keep such activity to a minimum, to execute short-term mutual fund trades only at the shareholder's request, and to submit switch forms to the home office for review.

Krull's recommendations in the Franklin Rising Dividends Fund ("Franklin Fund"), a common stock fund with an income and growth objective, are illustrative of what the Securities and Exchange Commission ("Commission" or "SEC") labeled a "clear pattern[]" of excessive trading.[1] Between June and October 1992, all eight customers purchased Franklin Fund shares on Krull's recommendation. Krull recommended the fund because of its Morningstar five-star rating,[2] one-year superior performance, management's disciplined approach, and the protection offered in the shaky economy. Krull's enthusiasm for the fund was short-lived and somewhat inconsistent. Soon after recommending purchase of this fund, Krull began switching customers out of the fund and, between December 1992 and June 1993, seven of the eight customers sold their Franklin Fund shares. In December, when other customers were selling their shares on Krull's advice, Krull recommended to one customer that he purchase this very same mutual fund and then in February and April 1993 switched this same customer out of the Franklin Fund and into funds outside the Franklin family of funds. As it turns out, intra-family switches within the Franklin family incurred no sales charge, and yet Krull offered no explanation why other Franklin family funds were not suitable investments. Nor did he explain the rationale for the quick switches in light of his strong buy recommendation. And when queried

---

1. The Commission's decision details these and other transactions in support of its conclusions about Krull's recommendation pattern. *See In re Kenneth C. Krull*, Exchange Act Release No. 34–40768, 68 S.E.C. Docket 2223, available at 1998 WL 849545 (Dec. 10, 1998).

2. Morningstar, established by Morningstar, Inc. of Chicago, is a mutual fund rating system ranging from one to five stars. Five stars is the highest rating.

about the customer who was buying Franklin when Krull was recommending a sell to other clients, he conceded that, "looking back on it, it doesn't [make any sense]."

Krull followed this same pattern of switching in other funds-Phoenix Growth Fund, Franklin Growth Fund, Idex Fund, Templeton World Fund, Sogen International Fund, and others. Although all of his customers ultimately profited from these transactions in absolute terms, six of the eight collectively earned $81,705 less by following Krull's recommendations than they would have by holding their initial fund investments. Krull, however, earned more than $171,000 in commissions on the switches.

## B. THE STRUCTURE OF THE DISCIPLINARY PROCESS

The disciplinary review process for a securities representative involves multiple levels of alphabet-soup entities. Here the process began with the District Business Conduct Committee ("DBCC") of the NASD and culminated in the SEC order that is on direct appeal to this court.

Established pursuant to the 1938 Maloney Act Amendments to the Securities Exchange Act of 1934, the NASD is a nonprofit corporation registered with the Commission as a national securities association. *See* Maloney Act, 52 Stat. 1070 (1938), 15 U.S.C. §§ 78o–3, *et seq.*, amending the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*; *see generally Austin Municipal Sec., Inc. v. NASD,* 757 F.2d 676, 679–81 (5th Cir.1985).

The NASD is required to promulgate rules "to protect investors and the public interest," 15 U.S.C. § 78o–3(b)(6), and to enforce these rules through disciplinary proceedings and sanctions, 15 U.S.C. §§ 78o–3(b)(7)–(8), 78o–3(h), 78s(g). The Commission approves proposed NASD rules, such as the Rules of Fair Practice (now known as Conduct Rules). 15 U.S.C. § 78s(b)(1), (b)(2).

At the time of this proceeding, the DBCC and the National Business Conduct Committee ("NBCC") were a part of the NASD's regulatory arm, or NASD Regulation, Inc. NASD Manual–Administrative 151, 153–54 (1996/1997). The regulatory and disciplinary process was restructured after Krull's case was filed. *See* Order,[3] Exchange Act Release 34–38908, 1997 WL 441929, at *32–35, 38 (Aug. 7, 1997) (approving proposed rule changes whereby DBCC and NBCC were restructured). The members of these committees were brokers and dealers within the securities community, thus assuring the collective business experience of securities professionals in each disciplinary decision. *See Hamilton Bohner, Inc.,* 50 S.E.C. 125, 1989 WL 257966, at *5 (1989); *see also* Order, 1997 WL 441929, at *32–35, 38.

Under this disciplinary regime, the DBCC makes the first determination as to a member's alleged misconduct. NASD Manual ¶¶ 9200 *et seq.* The DBCC's decisions are reviewable by the NBCC on its own motion or upon application of an aggrieved party. *Id.* at ¶¶ 9300 *et seq.* The final stop in the administrative process is review of the NBCC decision,

---

**3.** The full title of the Order is "Self–Regulatory Organizations; National Association of Securities Dealers, Inc.; Order Approving Proposed Rule Change and Amendment No. 1 to the Proposed Rule Change, Order Granting Accelerated Approval of Amendment No. 2 to the Proposed Rule Change, and Notice of Filing and Order Granting Accelerated Approval of Amendment Nos. 3, 4, and 5 to Proposed Rule Change Regarding Membership Application Procedures, Disciplinary Proceedings, Investigations and Sanctions Procedures, And Other Conforming Changes."

essentially the final NASD ruling, by the Commission. 15 U.S.C. § 78s(d), (e). Although the Commission reviews the record de novo, its review of the sanction is narrower-the sanction may be modified or canceled only if it is "excessive or oppressive." 15 U.S.C. § 78s(e); *Hateley v. SEC,* 8 F.3d 653, 655 n. 6 (9th Cir.1993); *Sartain,* 601 F.2d at 1371 n. 2.

## C. DISCIPLINARY PROCEEDINGS AGAINST KRULL

After a four-day hearing, the DBCC found that Krull had violated the Rules of Fair Practice by recommending purchases and sales of mutual fund shares without reasonable grounds to believe such transactions were suitable for his customers. A total of 147 transactions, or switches, were deemed unreasonable, in part because of NASD's presumption that short-term trading in mutual funds is improper. The DBCC imposed a fine of $50,000 and a ninety-day suspension. No restitution was ordered.

Although Krull did not appeal the DBCC decision, the NBCC called for review as permitted under the NASD Code of Procedure. NASD Manual ¶ 9311(a). Upon reviewing the DBCC's decision, the NBCC remanded the matter for reconsideration of the sanctions, instructing the DBCC to consider "the rationale regarding the sanctions, including the issue of restitution." On remand, the DBCC reduced the fine to $20,000, reaffirmed the ninety-day suspension, and ordered disgorgement of $202,783 (the amount of commissions received as a result of the switching activity).[4]

Krull appealed. After oral argument and a de novo review of the record, the NBCC affirmed the findings of unsuitability as to 115 transactions. The NBCC

imposed a $20,000 fine and, in lieu of disgorgement, restitution to the customers in the amount of Krull's commissions— $171,140.93 (modified and reduced from $202,783 because of the reduced number of improper switches found). The NBCC also increased the censure period, ordering a one-year suspension due to the "egregious nature of Krull's violative conduct."

Krull appealed again, this time to the Commission, which, after an independent review of the record, confirmed the unsuitability of Krull's mutual fund recommendations and sustained the finding of violation of the Rules of Fair Practice. The Commission did, however, modify the sanction by reducing the restitution. The parties stipulated that two of the eight customers made more through the switching than they would have through a "buy and hold" strategy. The Commission then ordered restitution of $81,705 to the remaining six customers representing the amount they would have earned had they held their initial investments without switches. The one-year suspension and $20,000 fine were affirmed. This petition for review of the SEC's order followed.

## II. STANDARD OF REVIEW

We review the Commission's factual findings for substantial evidence. 15 U.S.C. § 78y(a)(4); *Alderman v. SEC,* 104 F.3d 285, 288 (9th Cir.1997). In other words, we "weigh pros and cons in the whole record with a deferential eye," *Alderman,* 104 F.3d at 288, and the findings are conclusive if supported by substantial evidence. Congress granted the Commission broad supervisory responsibility over self-regulatory organizations such as NASD and requires the Commission to approve all rules, policies, practices, and

---

4. This figure varies from the final figure of approximately $171,000 because charges based on some of the transactions were later dismissed.

interpretations prior to implementation. 15 U.S.C. §§ 78o–3(b), 78s(b)(1)-(2). Because of the Commission's expertise in the securities industry, we owe deference to its construction of NASD's Rules of Fair Practice. *Alderman*, 104 F.3d at 288.

 The Commission's imposition of sanctions is reviewed for abuse of discretion. *Alderman*, 104 F.3d at 288; *Hateley*, 8 F.3d at 655. Our task is to assure that the sanction is supported by the law and facts, not to revisit the sanction anew or impose our independent judgment on the merits of the sanction. "It is a fundamental principle ... that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.' ... Only if the remedy chosen is unwarranted in law or is without justification in fact should a court attempt to intervene in the matter." *American Power & Light*, 329 U.S. at 112–13, 67 S.Ct. 133 (internal citation omitted); *see also Sartain*, 601 F.2d at 1374.

## III. ANALYSIS

### A. SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSION'S FINDINGS THAT KRULL MADE UNSUITABLE INVESTMENT RECOMMENDATIONS

 Mutual funds have long been categorized as suitable only as long-term investments and not a vehicle for short-term trading. Article III, Section 2 of the NASD's Rules of Fair Practice,[5] sets out principles for fair dealing with customers and the broad parameters for suitability of securities transactions:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

The Policy Statement of the Board of Governors issued under this rule admonishes that trading in mutual funds on a short-term basis[6] violates a responsibility for fair dealing and explicitly states that "normally [fund shares] are not proper trading vehicles and such activity on its face may raise the question of Rule violation."

The Commission has consistently considered short-term trading in mutual funds as inappropriate and violative of the rules on fair dealing because of the costs associated with front-loaded funds. The Commission pointedly noted in *In re Winston H. Kinderdick* that

> [m]utual fund shares generally are suitable only as long-term investments and cannot be regarded as a proper vehicle for short-term trading, especially where such trading involves new sales loads. A pattern of switches from one fund to

---

5. This rule has since been renamed Conduct Rule 2310. *See* Order Approving Proposed Rule Change by National Association of Securities Dealers, Inc. Regarding Rearranging of Rules and a New Rule Numbering System for the NASD Manual, Exchange Act Release No. 34-36698, 1996 WL 20844 (Jan. 11, 1996).

6. Although the Commission has not defined "short-term," its previous decisions focus on periods of less than one year as short-term. *See In re Richard Hoffman and Kirk Montgom-*

*ery*, 71 S.E.C. 1247, 2000 WL 64976, at *22 (Jan. 27, 2000) (referencing *In re Winston H. Kinderdick*, where the Commission noted examples of multiple switches in a year without explicitly stating holding period); *In re Russell L. Irish*, 42 S.E.C. 735, 1965 WL 3373, at *3 (Aug. 27, 1965), *aff'd*, 367 F.2d 637 (9th Cir.1966) (noting greatest percentage of switches had holding periods of less than one year).

another by several customers of a registered representative, where there is no indication of a change in the investment objectives of the customers and where new sales loads are incurred, is not reconcilable with the concept of suitability.

Exchange Act Release No. 34–12818, 46 S.E.C. Docket 636, 1976 WL 18843, at *3 (Sept. 21, 1976); *see also Terry Wayne White*, 50 S.E.C. 211, 1990 WL 310401, at *2 (Apr. 11, 1990) (restating presumption against using mutual funds as short term trading vehicles and noting such a pattern "only benefit[s] the salesman at the expense of his customer."); *Irish*, 42 S.E.C. 735, 1965 WL 3373.

Krull failed to meet his burden to justify more than one hundred of the challenged switches. *See Kinderdick*, Exchange Act Release No. 34–12818, 46 S.E.C. 636, 1976 WL 18843, at *3. For example, in the case of the Franklin Fund, Krull justified his sale recommendations based on his belief that newly-elected President Clinton seemed favorable to business and would institute policies favorable to domestic growth. The explanation for his sell recommendations was hardly convincing, however, when he was simultaneously making a buy recommendation to another customer. The pattern that emerges is one of Krull maximizing his commissions at the expense of the customer.

Krull's argument that his customers did not face excessive commissions when compared to churning (excessive trading) claims [7] or wrap fee accounts [8] does little to bolster his defense. This attempt to justify his recommendations on the premise that his customers profited, albeit not as much as they could have without excessive costs, ignores the fact that the focus of this suitability claim is not whether customers made money, but whether switches served a reasonable investment objective when made. The NASD, in a careful decision of more than fifty pages, analyzed each transaction and Krull's purported trading strategy, and found that the pattern of switching between funds was inconsistent with Krull's claimed rationale. In reviewing the record of Krull's trades, the Commission agreed with the NASD's assessment that Krull's explanations were "implausible and lacking any reasonable basis." The Commission also noted that it had previously rejected comparisons between churning and suitability claims, *see Kinderdick*, Exchange Act Release No. 34–12818, 46 S.E.C. at 640, 1976 WL 18843, at *3, and found comparisons to wrap accounts to be inapposite because switching here reduces the assets on which the representative's fee is based.

Because the Commission's findings are well supported in the record and carefully and appropriately analyzed in its decision, we affirm the finding of violation.

**7.** Churning claims arise when a broker, exercising control over an account, abuses a customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account. *See Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 821 (9th Cir.1980). Suitability claims are distinct from churning claims but may overlap when a broker recommends unsuitable trades for the purpose of churning. The distinction between the claims, however, is that unsuitability requires showing the quality of the investment is inappropriate whereas churning requires showing the quantity of

trades is improper. *See Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1, 5 (1st Cir.1983).

**8.** A wrap fee account is an investment program that "bundles or 'wraps' a number of services (brokerage, advisory, research, consulting, management, etc.) together and covers them with a single fee based on the value of the assets under management." NASD Regulation, *Glossary* (visited February 15, 2000) http://www.nasdr.com/glossary/w.html.

## B. THE COMMISSION DID NOT ABUSE ITS DISCRETION IN IMPOSING A ONE-YEAR SUSPENSION

■ Krull challenges the Commission's affirmance of the one-year suspension as punitive rather than remedial. *See United States v. Merriam*, 108 F.3d 1162, 1164 (9th Cir.1997); *Pierce v. SEC*, 239 F.2d 160, 163 (9th Cir.1956). He points out that he no longer engages in mutual fund switching, that he has had no subsequent customer or compliance complaints, and that a senior officer reviews all of his present transactions.[9] Krull's counsel argued these points eloquently on his behalf.

The appropriateness of the one-year suspension is a difficult issue because there is no clear rule as to when a sanction is remedial versus punitive and because the increase from ninety days to a year is significant, albeit within the recommended range of suspension sanctions. The standard of review, however, constrains us, even if we might decide otherwise were it left to our independent judgment. We are obligated to defer to the Commission so long as the Commission did not abuse its discretion.

Explicit in the Commission's affirmance is a determination that the sanction imposed by the NASD is not "excessive or oppressive." 15 U.S.C. § 78s(e). Although the expertise of the reviewing entities justifies the deference owed in each step of the review, this multi-layer process is by no means a rubber stamp. Indeed, before reaching us, the sanction was addressed on five separate occasions. In Krull's case, it is clear that each part and

the sanctions as a whole were rendered with care. The fine provides the first example. Although the DBCC initially imposed a $50,000 fine, on remand it reduced the fine to $20,000. Both the NBCC and the Commission affirmed the reduced fine. Similarly, the disgorgement/restitution issue was carefully tailored to Krull's situation. At the outset, the DBCC ordered no restitution. The NBCC instructed the DBCC to consider restitution and its remand resulted in a disgorgement order in excess of $200,000. When the NBCC reviewed the sanctions for the second time, restitution was substituted for disgorgement, as the NBCC apparently considered it more appropriate to reimburse the customers than to disgorge commissions, and the amount was reduced after a reconsideration of the disputed transactions.

Although the DBCC initially imposed a ninety-day suspension, the NBCC increased the suspension to one year after a detailed review of each transaction. In affirming the suspension, the Commission explained its reasoning and concluded that the sanctions were justified:

> For more than two years, Krull ignored his fundamental obligation of fair dealing by engaging in a pattern of short-term switches that placed his own interests in garnering commissions above those of his customers. Krull made no effort to reduce or eliminate sales charges on his customers' behalf. Moreover, his misconduct was knowing and deliberate. Krull was aware that his actions violated firm policy, and he de-

---

9. Krull's reliance on *Johnson v. SEC*, 87 F.3d 484 (D.C.Cir.1996), is not persuasive. There the D.C. Circuit only addressed whether the sanction imposed was a "penalty" for the purposes of the statute of limitations defined under 28 U.S.C. § 2462 (setting out statute of limitations for enforcement of any "civil fine, penalty, or forfeiture").

Likewise, Krull's reference to our discussion in *Hateley*, 8 F.3d at 655, is inapposite. In granting review, we held that the disgorgement order was unreasonable because the amount ordered was ten times the actual unjust enrichment.

liberately sought to conceal those activities from his employer. Under the circumstances, we do not consider the sanctions imposed by the NASD ... excessive or oppressive. 68 S.E.C. 2223, 1998 WL 849545, at *6.

█ Suspension is a matter that is appropriately within the discretion of the Commission—the agency charged with securities regulations—and the NASD—the body charged by the Commission with oversight of securities representatives. In Krull's case, we cannot say that the one-year suspension is unreasonable or that it is "unwarranted in law or without justification in fact." *Hateley*, 8 F.3d at 655. Neither the NASD nor the Commission viewed the ninety-day suspension as adequate. The NBCC's review included sev-. eral of the factors suggested by the NASD's Sanctions Guidelines for determining an appropriate sanction.[10] The Commission's reasoning highlighted many of these same factors. The factors are consistent with one of the key purposes of the Securities and Exchange Act, to protect the public interest by insuring the stability of the markets and integrity of representation by its participants. 15 U.S.C. § 78b. And, the year-long censure falls within the recommended suspension range of ten days to two years. This fact alone does not make it reasonable, but the wide range suggests the broad discretion available in imposing sanctions.

Krull's violations were unquestionably serious and continued over a long period. For two-and-one-half years, Krull ignored his obligation to his customers to make only suitable recommendations. He switched multiple customers into and out of mutual funds in a total of more than one-hundred transactions, failed to take advantage of mutual fund practices that would have reduced sales charges for fund purchases, ignored company rules and safeguards, and failed to submit switch forms which would have undoubtedly led to an earlier detection of his practices.

The record in this case is substantial, and Krull received a careful review of his case at every step of the process. In view of the Commission's expertise, the well-articulated rationale for the sanctions, and the circumstances of the violation, we cannot say that the Commission abused its discretion in affirming the one-year sanction.

**AFFIRMED.**

---

10. The Guidelines list factors for consideration when imposing sanctions, including the member's disciplinary history; member's voluntary or attempt, prior to detection, to remedy the misconduct; number of acts and/or pattern of misconduct and the duration of the misconduct; member's misconduct resulted directly or indirectly in injury to other parties and extent of that injury; member's misconduct resulted in potential for monetary or other gain; affected customer's level of sophistication; and member's conduct is deemed intentional. National Association of Securities Dealers, Inc., *NASD Sanction Guidelines* (visited February 15, 2000) http://www.nasdr.com/3100.dhome.htm.