**Russell PONCE, Petitioner,**

v.

**SECURITIES & EXCHANGE COMMISSION, Respondent.**

**No. 00–71398.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 3, 2002.

Filed Sept. 29, 2003.

Russell Ponce, Pro se, Reno, NV, for the petitioner-appellee.

Michael A. Conley, Securities and Exchange Commission, Washington, DC, for the respondent-appellant.

Before: FERGUSON, BRUNETTI, and TASHIMA, Circuit Judges.

## OPINION

FERGUSON, Circuit Judge:

Petitioner Russell Ponce ("Ponce") petitions for review of the Securities and Exchange Commission ("SEC")'s ruling that he (1) violated the Securities Exchange Act of 1934 ("Exchange Act"), Section 10(b) and Rule 10b–5 thereunder, by preparing and certifying financial statements of American Aircraft Corporation ("AAC"), filed with the SEC, that Ponce knew, or was reckless in not recognizing, were false; (2) willfully aided, abetted, and caused AAC to violate Exchange Act Section 13(a), and Rules 13a–1, 13a–13, and 12b–20, by filing reports with the SEC that contained false statements of material fact, and failing to correct misleading or omitted information; (3) willfully aided, abetted, and caused AAC to violate Exchange Act Section 13(b)(2), by failing to maintain AAC's books, records, and accounts to accurately and fairly reflect the transaction and disposition of AAC's assets; and (4) violated Rules 102(e)(1)(ii) and (iii) of the SEC's Rules of Practice by engaging in improper or unethical professional conduct in connection with AAC's accounting, and by aiding, abetting, and causing AAC's violation of federal securities laws, and rules and regulations thereunder. As a result of its decision, the SEC ordered Ponce to cease and desist his fraudulent activities, and permanently barred him from practicing before the SEC.

We hold that substantial evidence supports the SEC's ruling that Ponce violated federal securities laws, rules, and regulations in the course of performing accounting and auditing services for AAC. We further hold that the SEC's decision was not arbitrary, capricious, or otherwise not in accordance with the law, and that the sanctions imposed on Ponce by the SEC were not an abuse of discretion.

I

Ponce was a Certified Public Accountant[1] and served as AAC's[2] independent

---

1. Ponce let his CPA license lapse in September 1994.

2. AAC was an Oregon company based in Long Beach, California, engaged in the develop-

auditor from 1988 to 1991. The SEC's proceedings against Ponce stem from two distinct AAC matters and Ponce's role in their reporting and auditing. The SEC alleged that Ponce violated federal securities law by: (1) over-valuing license designs that AAC purchased from Moody Design Bureau and preparing, certifying, and submitting reports containing this over-valuation to the SEC; and (2) characterizing certain tooling[3] and prototype expenses as inventory in AAC's financial statements. It also held that Ponce had violated SEC Rules of Practice 102(e)(1)(ii) and (iii) by engaging in improper professional conduct, and by virtue of assisting AAC's violations of federal securities laws.

The SEC's Enforcement Division issued an Order Instituting Proceedings ("OIP") and instituted a Cease and Desist Proceeding against Ponce pursuant to Section 21C of the Exchange Act on February 13, 1996. A hearing on the matter was held before an Administrative Law Judge ("ALJ"), during which Moody, Adolfo Batista,[4] and Loreto Tersigni, a Certified Public Accountant who was qualified as an expert regarding generally accepted accounting principles ("GAAP"), generally accepted auditing standards ("GAAS"), and professional standards in accounting, testified. Ponce also testified on his own behalf. Crediting Ponce's explanations of his accounting and auditing practices discussed *infra,* and noting the inherent difficulties of precise financial reporting, the ALJ

ruled that Ponce did not violate Rule 102(e)(1)(ii) or (iii) of the SEC's Rules of Practice, nor did he willfully violate or willfully aid or abet the violation of any federal securities laws, rules, or regulations.

The SEC's Enforcement Division appealed the ALJ's decision. After conducting an independent review of the record, the SEC reversed the ALJ's decision. Ponce filed a timely petition for review on October 30, 2000.

The following is a recitation of the undisputed facts with respect to each of the matters involved in the SEC's proceedings against Ponce.

## A.  *The License Designs*

In February 1988, AAC purchased from Moody Design Bureau, a sole proprietorship of William J. Moody ("Moody"), all rights and an exclusive license to manufacture certain aircraft, patent application files, copyrights, and design patents for aircraft and helicopters (hereinafter "the License Designs"), for 2.5 million shares of restricted AAC stock.

In March 1988, AAC acquired the assets and operations of Phalanx Organization, Inc. ("Phalanx"). This transaction is termed a "reverse acquisition," because AAC purchased all of Phalanx's assets, valued by AAC at $124,742. In exchange, AAC issued 28,673,440 shares of its com-

---

ment of ultra light aircraft. AAC's stock was registered with the SEC pursuant to Section 12(g) of the Exchange Act.

**3.**  William J. Moody, the president and chairman of AAC, defined "tooling" during his testimony before the ALJ ("Administrative Law Judge") as "devices that are fabricated from engineering drawings or from CAD, Computer Aided Designs, print-out designs, to develop what we call in the industry a Plug, which is a Master, from which we pull a

composite mold for which we can then fabricate the complete aircraft structure."

Generally, it is also defined as: "1. Work or ornamentation done with tools, esp. stamped or gilded designs on leather. 2. Provision of machinery to a factory in preparation for production." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1217 (1984)."

**4.**  Batista was AAC's bookkeeper for the years in question.

mon stock for the assets, the equivalent of $.0044 a share. Prior to the merger, Moody was Phalanx's president and controlling shareholder; after the transaction, he became the president and CEO of AAC.

In his 1988 audit of AAC's financial statements, Ponce valued the License Designs as an asset worth $4,687,500. After discussions with AAC's management, Ponce arrived at this valuation by taking AAC's share bid quoted on NASDAQ on the day AAC issued the 2.5 million restricted shares in exchange for the License Designs, $3.75, and discounting it by fifty percent.

## B.  *Tooling and prototype costs*

### (1) Tooling

Moody executed and sent letters to Ponce for AAC's 1989, 1990, and 1991 financial statements, representing that AAC had progressed beyond the research and development stage in developing certain aircraft and that, as a result, their tooling was properly capitalized. Specifically, the letters stated that in 1989 this was true for the Dragon, Falcon, Hind, Patriot, and Cobra projects; in 1990 for the Dragon, Falcon, Hind, and Penetrator projects; and in 1991 for the Falcon, Hind, Patriot, and Penetrator projects. However, in the Form 10-K annual reports for 1990 and 1991, AAC disclosed that it had not completed development on its Penetrator helicopter project. Also, at the hearing before the ALJ, Moody testified that the Falcon and Hind were never flight tested.

Additionally, in April 1989, AAC's Board of Directors passed a resolution that the tools for the Hind, Falcon and Dragon aircraft be capitalized in the amount of $862,649. However, AAC's 1989 Form 10-K annual report stated that the company had recently acquired designs for the Hind, Falcon, Dragon, and Patriot and had to expend "a significant amount of its capi-tal in [their] research, development and tooling."

At the hearing before the ALJ, Ponce testified that he discussed the treatment of tooling costs with AAC's management. Initially it was Ponce's belief that they be treated as research and development; however, Moody insisted that since it was not new technology, it should be capitalized. Ponce had previously told Moody on other occasions that tooling costs were research and development and thus should be expensed. As such, the tooling costs were initially recorded as expenses when incurred.

In the end, Ponce treated AAC's tools as assets worth $1,435,575 in the Form 10-K annual report for 1989. Similarly, in its 1990 Form 10-K annual report, tools and molds were treated as assets worth $1,222,896. This was true even though the Penetrator was the only project in active development and AAC had written off tools for projects that were deferred in the amount of $508,889.

### (2) Prototypes

During fiscal year 1991, AAC capitalized certain costs related to the manufacture of its aircraft prototypes. In its 1991 Form 10-K, AAC disclosed that "since January 1990, [it] had been developing the Penetrator, a remanufactured version of the UH1 Huey helicopter[,]" that was now obsolete. They also disclosed that after flight testing, which began in December 1991, the single Penetrator "proof of concept" would be "disassembled and analyzed." Ponce initially recorded the prototype costs for the Penetrator as expenses when incurred. Once again, Moody disagreed with Ponce's characterization of the prototype costs because he believed them to be assets. Ponce then directed AAC's bookkeeper, Adolfo Batista, to adjust the

accounting records and financial statements for 1991 to reflect Moody's position that the prototype costs were assets. In the end, AAC reported the Penetrator prototype as assets valued at $562,847 and $1,973,193 in 1990 and 1991, respectively.

## C. Ponce's unpaid fees

During the years in question, AAC accumulated and carried a balance of outstanding fees that it owed Ponce for his accounting and auditing services. These outstanding fees serve as a basis for the SEC's allegations that Ponce violated Rule 102(e)(1)(ii) of the SEC's Rules of Practice, engaging in improper professional conduct by failing to maintain his independence from the company.[5] On February 28, 1989, Ponce sent a letter to Moody regarding his impending audit of AAC for fiscal year 1988. Ponce wrote that "the unpaid balance due to [him] for services rendered in prior periods is $17,769." On February 12, 1990, he again noted that "the unpaid balance due to [him] for services rendered in prior periods is $35,759." A similar letter from Ponce to Moody dated November 14, 1990 reflected an unpaid balance of $31,000.

Additionally, a letter dated March 29, 1991 from Ponce to Moody delineated a schedule of payments to satisfy the balance owed to him by AAC and also reflected what would be an unpaid balance of $65,000, at the completion of the audit for fiscal year 1990. Lastly, a letter dated December 30, 1991 from Ponce to Moody regarding the fiscal year 1991 audit notes an unpaid balance of $54,522.

Ponce testified at the hearing before the ALJ that he discussed the issue of his unpaid fees every year with AAC. Ponce also testified that he advised AAC that the guidelines put forth by the American Institute of Certified Public Accountants ("AICPA") presumed a lack of independence if an auditor has outstanding audit fees at the time he performs an audit.

## II

■ We review the SEC's factual findings to determine if they are supported by substantial evidence. 15 U.S.C. § 78y(a)(4) (1996); *Alderman v. SEC,* 104 F.3d 285, 288 (9th Cir.1997). This review mandates that this Court examine the evidence with a "deferential eye." *Id.* at 288 (citations omitted). If, after this weighing, we determine that the evidence is open to more than one interpretation, we are required to uphold the SEC's finding. *Id.* "Substantial evidence constitutes 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Eichler v. SEC,* 757 F.2d 1066, 1069 (9th Cir.1985) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

■ Similarly, we give deference to an agency's construction of its own regulations unless the interpretation is "unreasonable" or "plainly erroneous." *Alderman,* 104 F.3d at 288 (quoting *Lambert v. Fed. Deposit Ins. Corp.,* 847 F.2d 604, 606 (9th Cir.1988)). "The Commission's conclusions of law are to be set aside if arbitrary, capricious, or otherwise not in accordance with law." *Rutherford v. SEC,* 842 F.2d 214, 215 (9th Cir.1988); 5 U.S.C. 706(2)(A) (2002). We review the SEC's imposition of sanctions for an abuse of

---

**5.** The SEC also found that Ponce had engaged in improper professional conduct by failing to act with due professional care in performing his audit because he conducted no investigation to corroborate AAC management's representations that its aircraft designs had progressed beyond research and development and should be capitalized, and falsely stating that his audits were conducted in accordance with GAAP.

discretion. *Sorrell v. SEC*, 679 F.2d 1323, 1327 (9th Cir.1982) (citation omitted).

## A. *Ponce's violation of Exchange Act Section 10(b) and Rule 10b–5*

The first question we must address, which sets the stage for the remainder of our review of the SEC's findings, is whether there exists substantial evidence to support the SEC's conclusion that Ponce violated Section 10(b) and Rule 10b–5. The SEC found that Ponce violated Section 10(b) and Rule 10b–5 by falsely representing that he audited AAC's financial statements in accordance with generally accepted auditing standards ("GAAS"), and that AAC's financial statements were not set out in conformity with generally accepted accounting principles ("GAAP"). Specifically, the SEC held that Ponce overvalued the License Designs in AAC's financial statements and improperly capitalized research and development costs, which should have been expensed. On appeal, Ponce argues that there lacks substantial evidence to support the finding that he violated these anti-fraud provisions. We hold that there is substantial evidence to support the SEC's factual findings underlying the violations and find no grounds on which to set aside the SEC's ultimate conclusion that Ponce violated Section 10(b) and Rule 10b–5, as it was not arbitrary or capricious.

Section 10(b) of the Exchange Act states, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use ... of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1996). Companion Rule 10b–5 provides that it is unlawful to use any facility of the national securities exchange "[t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(a) (1996). It also provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" *Id.* at § 240.10b–5(b).

■ "To prove a primary violation of Section 10(b) of the Securities Exchange Act, the SEC [is] required to 'show that there has been a misstatement or omission of material fact, made with scienter.'" *SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir.1996) (quoting *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 875 (9th Cir. 1994)). In the Ninth Circuit, scienter may be established by demonstrating that the defendant acted recklessly. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990). The *Hollinger* court defined recklessness in the securities context as:

[A] highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044 (7th Cir.1977)).

■ Auditors violate Section 10(b) and Rule 10b–5 by preparing and certifying publicly filed financial statements that they know, or are reckless in not knowing,

are false. *Davy v. SEC*, 792 F.2d 1418, 1422–23 (9th Cir.1986). Whether a public statement is misleading is reviewed for substantial evidence. *Id.* (finding substantial evidence and upholding SEC finding that Davy knew his audit report was misleading).

■ The SEC found that Ponce recklessly made false and misleading material statements in the course of preparing and auditing AAC's financial statements, with respect to the License Designs and aircraft tooling and prototype costs.

(1) False or misleading statements about the License Designs

The SEC held that Ponce violated Section 10(b) and Rule 10b–5 by overvaluing the License Designs AAC purchased 14448 from Moody. The crux of Ponce's argument challenging the SEC's findings with respect to the overvaluation of the License Designs is that he included a footnote to the financial statements in which he disclosed the "nature and the effect" of the accounting methods, thereby rendering the statements neither false nor misleading, and precluding a finding that he prepared and certified statements that were false or misleading. The footnote, Note 5, read as follows:

*VALUATION ANALYSIS*

The Company's investment in Moody Aircraft Design Bureau is based on management's estimate of value relating to the consideration paid by the Company in the form of its restricted common stock and not on appraised values or historical cost data of the assets acquired. This alternative method of valuation is a less desirable test of value,

however, appraisals of the intangible assets acquired, namely, designs and related data, may be difficult, if not impossible. Nevertheless, because the amounts recorded on the Company's books of account are so material as to represent essentially all of the stockholder's equity, the correctness of management's valuation is critical to the Company's continued existence as a going concern as discussed in Note 10.

Note 10 reads as follows:

*BASIS OF PRESENTATION—CONTINUED EXISTENCE*

The Company has experienced significant losses, and it has no working capital. In addition, certain intangible assets are the basis for the equity on the balance sheets, as discussed in Note 5.

The accompanying financial statements have been presented using accounting principles applicable to a going concern, which principles contemplate the realization of assets and satisfaction of liabilities in the normal course of business. The Company's continued existence is dependent on its ability to achieve profitable operations through product sales and to obtain additional equity and/or debt financing sufficient to finance production levels necessary for profitable operations.[6]

Ponce argues that, given the above disclosure, "even if subsequent events have shown that the treatment of information included in the financial statements that [he] audited were not correct, its inclusion in the statements did not violate the antifraud provisions" because the SEC has not shown that his actions were deceptive.

---

**6.** Although the precise language of the notes varied depending upon the projects that were underway during each reporting period, the critical information remained the same and the gist of the disclosure was the same for

each report. The above quote was taken from Ponce's report of AAC's financial statements through November 30, 1989, dated March 15, 1990.

Ponce cites *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir.1996), to support his assertion that his actions were not deceptive.

The SEC considered and rejected Ponce's argument that the statements were not misleading because he disclosed the valuation method for the License Designs in a footnote to the financial statements. It found that the footnote failed to elucidate the information that rendered the valuation suspect, including the subsequent price paid by Phalanx for AAC stock, *99.8% lower than originally valued,* Ponce's belief that the License Designs were not worth the value assigned, and the fact that AAC's stock was thinly traded and thus an unreliable benchmark. In short, the SEC found that the footnote was insufficient to cure the defect that resulted from the overvaluation and that potential investors or shareholders were not given accurate information in the financial statements.

The record reveals substantial evidence to support the SEC's finding that the valuation of the License Designs in AAC's financial statements was misleading and that footnote 5 did not cure this defect. Ponce did not dispute the significance of the information that the SEC found to be material and absent from the footnote, nor did he point to any information in the statements, aside from the footnote, that would make the valuation less misleading. There is evidence in the record to support the SEC's assertions above, namely that AAC's stock was thinly traded and that after AAC's purchase of the License Designs, Phalanx paid a price that was 99.8% lower than originally valued for AAC's stock.

Moreover, Ponce's testimony at the hearing before the ALJ reveals that he was fully aware of the problems associated with the valuation method he used for the License Designs, yet he nonetheless did not alter the valuation. Ponce stated that the purpose of the footnote was "to let the reader know that [their valuation method] was just a way of doing it, and it may or may not be correct." In addition, Ponce admitted that he had reservations about valuing the License Designs at $4,687,500 and believed that AAC could not sell them for the assigned value. Despite these reservations, he nevertheless retained the valuation and certified the financial statements.

Ponce's argument that he cannot be found to have violated Section 10(b) because he was not "deceptive" and his reliance on *Anixter* are misplaced. Ponce fails to recognize that in our circuit, recklessness satisfies Section 10(b)'s scienter requirement. *See Hollinger,* 914 F.2d at 1568–69. *Anixter* did nothing to alter this scheme. Moreover, there is evidence in the record to sustain the SEC's finding that Ponce acted recklessly in valuing the License Designs and certifying the statements containing the valuation. The SEC offered Tersigni's expert testimony that Ponce's chosen method of valuing the License Designs, based on AAC's stock price, was not only an unacceptable methodology for valuing thinly traded stock, but also unreliable because of AAC's history of operating losses, virtual insolvency, and the fact that the stock was thinly traded. Further, Ponce was aware of the false impression it could give the public, yet he proceeded with the valuation in the face of this danger.

In light of the above, Ponce's certification of AAC's financial statements was inconsistent with GAAS, and in violation of Section 10(b) and Rule 10b–5, since it contained misleading information regarding AAC's financial assets, and Ponce was reckless as to its misleading nature. In sum, the SEC's conclusion that Ponce's

valuation of the License Designs, and certification of the financial statements containing the valuation, violated Section 10(b) and Rule 10b–5 is supported by substantial evidence. *See Eichler,* 757 F.2d at 1069.

### (2) False or misleading statements about prototype and tooling costs

█ The SEC also held that Ponce violated Section 10(b) and Rule 10b–5 by capitalizing prototype and tooling costs, rather than expensing them in conformity with financial accounting standards. Ponce argues that this finding should be set aside because he was instructed to capitalize the tooling and prototype costs by AAC's management. We hold that substantial evidence supports the SEC's finding that Ponce prepared and certified financial statements containing these capitalized prototype and tooling costs that he knew or should have known were false. We further hold that AAC's management's directives to Ponce instructing him to capitalize research and development costs do not absolve Ponce from his duty as an auditor to certify only accurate financial statements and reports.

Financial Accounting Standard ("FAS") 2[7] provides guidance regarding how to report research and development costs, namely the tooling and prototype costs associated with AAC's development of aircraft. FAS 2 defines both "research" and "development," and also designates a list of activities that constitute research and development which should be expensed. The SEC alleges that AAC's tooling and prototype costs fell squarely into FAS 2 Paragraph 9(f): "Design, construction, and testing of preproduction prototypes and models[,]" and 9(g): "Design of tools, jigs, molds and dies involving new technology." Although perhaps not as clear as the SEC contends, the record supports the SEC's finding that the tooling and prototype costs should not have been capitalized. Notably, only *one* of AAC's aircrafts, the Penetrator, arguably progressed past the research and development stage, and only after the years in question. However, its costs were capitalized despite the fact that the Penetrator still needed to be flight tested, after which it would be disassembled and evaluated. None of AAC's other projects were ever manufactured.

Moreover, there is also evidence that Ponce was aware of, yet chose to disregard, the impropriety of recording AAC's prototype and tooling costs as assets for projects that were still in development. First, Ponce testified that he initially disagreed with AAC's management about how to characterize these costs and believed they should be recorded as research and development expenses, not assets. Ponce fails to give reasons, other than that he had "substantial discussions with manage-

---

7. FAS 2 reads in relevant part:

This Statement establishes standards of financial accounting and reporting for research and development costs with the objectives of reducing the number of alternative accounting and reporting practices presently followed and providing useful financial information about research and development costs. This Statement specifies:

a. Those activities that shall be identified as research and development for financial accounting and reporting purposes.

b. The elements of costs that shall be identified with research and development activities.

c. The accounting for research and development costs.

d. The financial statement disclosures related to research and development costs.

ACCOUNTING FOR RESEARCH AND DEV. COSTS, Statement of Financial Accounting Standards No. 2, ¶ 1, http://www.fasb.org/pdf/fas2.pdf (Fin. Accounting Standards Bd.1974); *see generally* RESEARCH AND DEV. § R50 (Fin. Accounting Standards Bd.1988).

ment and management's representations that contracts were on hand for immediate production," for changing his mind. Ponce's failure to conduct any meaningful investigation into management's representations is inexcusable. Even if it were true that contracts were on hand for some of the projects, under FAS 2 this fact would still not be dispositive of the research and development issue. FAS 2 requires a more nuanced analysis of the projects to ensure accurate reporting. As discussed *infra*, GAAS requires that Ponce inquire into management's representations and conduct his own, independent research to determine whether its assertions are true. Ponce failed to offer any evidence that he verified AAC's representations regarding the prototype and tooling costs, and instead largely relied on their assurances, which Ponce had reason to believe were inaccurate.

Ponce's admission and AAC's misrepresentations notwithstanding, AAC's annual and quarterly reports reveal that the projects at issue were still in development at the time that they were capitalized.[8] Moody testified to this effect about a number of AAC's projects between 1988 and 1991. Ponce nevertheless included a note to the financial statements in AAC's reports which indicated that he complied with FAS 2, when in actuality research and development costs were consistently treated as assets. Thus, Ponce conveyed false assurances that AAC had complied with FAS 2, compounding the misconceptions that, in conjunction with the overvaluation of the License Designs, painted a rosier financial picture of AAC than actually existed.

The record in this case contains sufficient evidence to support the SEC's conclusion that Ponce's valuation of the License Designs and his capitalization of

tooling and prototype costs were not in accordance with GAAS. Similarly, the financial statements he certified were not prepared in conformity with GAAP, as they contained the same defects. At the hearing before the ALJ, the SEC presented testimony from Loreto Tersigni, a Certified Public Accountant who was qualified as an expert regarding GAAP, GAAS, and professional standards in the accounting profession. He testified extensively about GAAP and GAAS, and rendered an opinion that Ponce's valuation of the License Designs and his treatment of the prototype and tooling expenses were not in conformity with GAAP. He also opined that, to the extent he did not correct them or disclose the defects, Ponce's audits were not conducted according to GAAS. Ponce does not challenge Tersigni's opinion regarding GAAP or GAAS, nor does he offer alternative evidence that his valuation of the License Designs, and characterization of tooling and prototype costs, were proper under those standards.

In sum, the SEC's conclusion that Ponce violated Section 10(b) and Rule 10b–5 by certifying that AAC's statements complied with GAAP and that his audit was conducted according to GAAS, in light of the evidence of serious departures contained in the record, is supported by substantial evidence. Both the valuation of the License Designs and the capitalization of research and development costs portrayed an overall picture of AAC as having greater assets and financial stability than in reality it did. This, in the final analysis, is dispositive. *See SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1106–07 (9th Cir.1977) (holding that the overall effect of advertisements was misleading in violation of Section 10(b) despite fact that no single statement of material fact was false). Furthermore, there is

8. *See* Part I, B, (1) of this opinion.

substantial evidence that Ponce was aware of the defects and was reckless in certifying the financial statements.

B. *Ponce's aiding and abetting of AAC's violation of Section 13(a) and 13(b)(2) and corresponding regulations*

■ Next, we must decide whether there exists substantial evidence to support the SEC's conclusion that Ponce willfully aided, abetted, and caused AAC to violate Section 13(a) and 13(b)(2) of the Exchange Act, and their companion regulations.[9] Based on Ponce's role in the overvaluation of the License Designs and his mischaracterization of the tooling and prototype costs, the SEC held that Ponce had willfully aided, abetted, and caused AAC's filing of misleading reports and caused it to fail to correct these reports in violation of Exchange Act Section 13(a), and Rules 12b–20 and 13a–1. It also held that Ponce willfully aided, abetted, and caused AAC's filing of false annual and quarterly reports that were misleading in violation of Rules 13a–1 and 13a–13. Lastly, the SEC held that Ponce willfully aided, abetted, and caused AAC's violation of Exchange Act Section 13(b)(2) resulting from AAC's failure to keep books, records, and accounts that accurately and fairly reflected the transactions and disposition of AAC's assets. We hold that substantial evidence supports the SEC's conclusions that Ponce violated Exchange Act Section 13(a) and 13(b)(2), and their corresponding regulations.

Exchange Act Section 13(a) and Rule 13a–1 require "every issuer having securities registered" with the SEC to file annual reports including certain financial information. Section 13(a) was codified as 15 U.S.C. § 78m(a) (1996) and reads as follows:

Periodical and other reports

(a) Reports by issuer of security; contents

Every issuer of a security registered pursuant to section 78*l* of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78*l* of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.

(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Every issuer of a security registered on a national securities exchange shall also file a duplicate original of such information, documents, and reports with the exchange.

9. While some courts have held that "[i]f one violates Section 10(b)/Rule 10b–5 by filing false financial statements with the SEC, one also runs afoul of the reporting requirements of Section 13[,]" *SEC v. Kahn*, No. 99 C 6343, 2002 WL 1163723, at * 8 (N.D.Ill. May 31, 2002) (citing *SEC v. Schiffer*, No. 97 CV 5853, 1998 WL 307375, at *3 n. 11 (S.D.N.Y. June 11, 1998)), we will nonetheless proceed with a thorough analysis of whether Ponce has also violated Section 13.

Similarly, Rule 13 a 1 was codified as 17 C.F.R. § 240.13a–1 (1996) and reads as follows:

Requirements of annual reports.

Every issuer having securities registered pursuant to section 12 of the Act shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Registrants on Form 8–B, s 249.308b of this chapter, shall file an annual report for each fiscal year beginning on or after the date as of which the succession occurred. Annual reports shall be filed within the period specified in the appropriate form. At the time of filing the annual report, the registrant other than a person registered under the Public Utility Holding Company Act of 1935 or the Investment Company Act of 1940 shall pay to the Commission a fee of $250, no part of which shall be refunded.

In short, these provisions of the Exchange Act require the filing of financial statements that (1) are prepared in conformity with GAAP; and (2) contain a report by an independent auditor certifying that the auditor had audited the company's financial statements, in accordance with GAAS, to determine whether the statements were prepared in conformity with GAAP. Under Rule 12b–20, AAC had a duty to correct any misstatements or omissions in documents filed with the SEC. This rule was codified as 17 C.F.R. § 240.12b–20 (1996) and reads as follows:

Additional information.

In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circum-stances under which they are made not misleading.

Section 13(b)(2) requires companies to maintain books, records and accounts accurately and record transactions in conformity with GAAS. Section 13(b)(2) was codified as 15 U.S.C. § 78m(b)(2) (1996) and reads in relevant part:

Periodical and other reports

. . .

(b) Form of report; books, records, and internal accounting; directives

. . .

(2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall—

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

(i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Finally, Rule 13a–13 requires the filing of quarterly reports that are not mislead-

ing. 17 C.F.R. § 240.13a–13 (1996), reads in relevant part as follows:

> Quarterly reports on Form 10–Q and Form 10–QSB (§ 249.308a of this chapter).
>
> (a) Except as provided in paragraphs (b) and (c) of this section, every issuer that has securities registered pursuant to section 12 of the Act and is required to file annual reports pursuant to section 13 of the Act, and has filed or intends to file such reports on Form 10–K and Form 10–KSB (§ 249.310 of this chapter) or U5S (§ 259.5s of this chapter) shall file a quarterly report on Form 10–Q and Form 10–KSB (§ 249.308a of this chapter) within the period specified in General Instruction A.1. to that form for each of the first three quarters of each fiscal year of the issuer, commencing with the first fiscal quarter following the most recent fiscal year for which full financial statements were included in the registration statement, or, if the registration statement included financial statements for an interim period subsequent to the most recent fiscal year end meeting the requirements of Article 10 of Regulation S–X, for the first fiscal quarter subsequent to the quarter reported upon in the registration statement. The first quarterly report of the issuer shall be filed either within 45 days after the effective date of the registration statement or on or before the date on which such report would have been required to be filed if the issuer has been required to file reports on Form 10–Q and Form 10–QSB as of its last fiscal quarter, whichever is later.

Insofar as the SEC based its findings as to these violations on the largely undisputed facts that gave rise to the Section 10(b) and Rule 10b–5 violations, the SEC's conclusion that Ponce violated the reporting and record keeping provisions of the Exchange Act is also supported by substantial evidence. Ponce does not deny that he prepared and certified AAC's annual and quarterly reports during the years in question, nor does he otherwise dispute the reporting and record keeping requirements that the SEC imposed on him. Ponce also does not dispute that the violation of 10(b) and 10b–5 would subject him to liability under Section 13(a) and 13(b)(2), but merely argues that this finding must fail because the 10(b) and 10b–5 violations fail.

Since the facts underlying the anti-fraud violations provide the same factual basis for the reporting and record keeping violations of the federal securities laws, and we held earlier in this opinion that substantial evidence supports Ponce's anti-fraud violations, we hold that the SEC's findings that Ponce violated Section 13(a) and 13(b)(2) of the Exchange Act and associated rules thereunder are similarly supported by substantial evidence and are not arbitrary, capricious, or otherwise not in accordance with the law. The record reveals that AAC's financial statements contained the over-valuation of the License Designs, as well as the mischaracterization of tooling and prototype costs, both practices which were not in conformity with GAAP as required by Section 13(a) and Rule 13a–1. Furthermore, it is evident that Ponce's audits and certification of AAC's reports were not conducted in conformity with GAAS, because he certified them despite the fact that AAC's financial statements contained the aforementioned misleading information, in contravention of Section 13(a) and Rule 13a–1.

The same misleading financial statements that were submitted and certified with AAC's annual reports were submitted with AAC's quarterly reports, in violation of Rule 13a–13. In addition, pursuant to Rule 12b–20, AAC had a duty to correct

any misstatements or omissions in documents filed with the SEC, which it also failed to do, footnote 5 notwithstanding. Moreover, the overvaluation of the License Designs and the improper capitalization of the tooling and prototype costs depicted AAC as having more assets than it actually did. Thus, Section 13(b)(2) was also violated because AAC failed to keep books, records, and accounts that accurately and fairly reflected the transactions and disposition of AAC's assets.

Our finding that AAC violated Exchange Act Sections 13(a) and 13(b)(2), and accompanying rules, does not end our inquiry with respect to Ponce's liability. The SEC found that Ponce had willfully aided, abetted, and caused AAC's violation of the above record keeping provisions. Although there is apparently no circuit law articulating the requirements for aider and abettor liability for Section 13 violations, we are guided by cases finding aider and abettor liability of other securities laws violations. In order to find that Ponce aided and abetted AAC's violation of federal securities laws, it must be found that: (1) AAC violated the relevant securities laws; (2) Ponce had knowledge of the primary violation and of his or her own role in furthering it; and (3) Ponce provided substantial assistance in the primary violation.[10] *See Fehn,* 97 F.3d at 1288 (fashioning a test for aiding and abetting a Section 15(d) violation based on Section 104 of the Private Securities Litigation Reform Act and the test for aiding and abettor liability for Section 10(b) violations); *Graham v.*

*SEC,* 222 F.3d 994, 1000 (D.C.Cir.2000) (identifying three principal elements to establish liability for aiding and abetting a Section 10(b) and Rule 10b–5 violation as "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter' . . . ."); *accord SEC v. Arthur Young & Co.,* 590 F.2d 785, 786 (9th Cir.1979) (recognizing aiding and abetting liability under Sections 10(b), 13(a) and 15(d) of the Exchange Act); *SEC v. Kalvex, Inc.,* 425 F.Supp. 310, 316 (S.D.N.Y.1975) (holding corporate director liable for aiding and abetting violations of Exchange Act Sections 14(a), 13(a), and Rules 13a–1 and 13a–13 because he "provided assistance and encouragement to conduct patently in violation of the securities laws[.]").

The first prong of the aider and abettor test is easily met. AAC filed the required reports that contained the false and misleading financial statements, along with Ponce's audit certification. Moreover, Ponce does not dispute his role in preparing the financial statements or performing the audits. Second, while Ponce may not have conceived them as false or misleading at the time he made them,[11] Ponce certainly had knowledge, or at least was reckless in not recognizing, the misleading nature of the statements. Ponce undeniably played a major role in preparing and certifying the financial statements, and as AAC's accountant and auditor, Ponce not only facilitated AAC's reporting and rec-

---

**10.** The SEC's decision below articulates the third prong of the test as "Ponce's knowing or reckless substantial assistance in the conduct constituting those violations." However, in at least one proceeding the SEC has held that a scienter requirement is not necessary since Section 13(a) violations do not require scienter. *In the Matter of WSF Corp.,* 2002 WL 917293, *3 (SEC, May 8, 2002). Similarly, a

plain reading of Section 13(b) reveals that it also does not impose a scienter requirement.

**11.** Ponce continues to argue on appeal that the valuation of the License Designs and the mischaracterization of the tooling and prototype costs were not false or misleading. The SEC debunked and rejected these arguments, and we do so as well.

ord keeping responsibilities to the SEC, but he played an essential and integral part of the process. Indeed, Exchange Act Section 13(a) and Rule 13a–1 require that a registrant's reports be filed with audit certification. Accordingly, Ponce also provided substantial assistance to AAC's primary violation of Sections 13(a) and 13(b)(2), by preparing the financial statements that were eventually filed with both the quarterly and annual reports, as well as auditing and certifying the reports that AAC filed. We hold that there is substantial evidence to support the factual findings underlying the SEC's conclusion that Ponce aided and abetted AAC's violation of Exchange Act Sections 13(a), 13(b)(2) and corresponding regulations, and that the conclusion itself is not arbitrary or capricious.[12]

C. *Ponce's violation of Rules 102(e)(1)(ii) and (iii) of the SEC's Rules of Practice*

■ The next issue before us is to examine the SEC's findings that Ponce violated two of its Rules of Practice, and whether there is substantial evidence to uphold its conclusions in this respect. First, the SEC permanently barred Ponce from practicing before it pursuant to Rule 102(e)(1)(iii) of the SEC's Rules of Practice, based on his violations of Exchange Act Section 10(b) and Rule 10b–5, Sections 13(a) and 13(b)(2), and corresponding regulations. The SEC went on to find that Ponce also violated Rule 102(e)(1)(ii) because he had engaged in "improper professional conduct." We hold that both findings are supported by substantial evidence and are not arbitrary, capricious, or otherwise not in accordance with the law.

SEC Rule of Practice 102(e)(1), codified as 17 C.F.R. § 201.102 (1996), reads in relevant part:

(e) Suspension and disbarment.

(1) Generally. The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice and opportunity for hearing in the matter:

. . .

(ii) To be lacking in character or integrity or to have engaged in unethical or improper professional conduct; or

(iii) To have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

Because we hold that the SEC's finding that Ponce violated federal securities laws is supported by substantial evidence, it follows that the SEC's finding that Ponce violated Rule 102(e)(1)(iii) is also supported by substantial evidence. However, the SEC also held that Ponce was subject to sanctions under Rule 102(e)(1)(ii), by engaging in the following improper professional conduct that violated GAAS: (1) he did not act with due professional care in performing his audit, because he conducted no investigation to corroborate management's representations that the aircraft designs were no longer in the research and development stage, and that tooling and prototype costs were properly capitalized; (2) he falsely stated that his audits were conducted in accordance with GAAP; and (3) he did not comport with the independence requirements set out by GAAS due

---

**12.** The SEC also held that Ponce *caused* AAC's violation of the record keeping and reporting requirements under Section 13. Because we find that Ponce aided and abetted AAC's violation, it is not necessary to determine whether he also "caused" AAC's violation, thus we do not reach the issue.

to the outstanding fees that AAC owed him.

The SEC's findings that Ponce engaged in improper professional conduct are supported by substantial evidence. Ponce does not dispute that he did not conduct any investigation into AAC's representations that prototype and research costs should be capitalized because the projects they related to were no longer in development, rather he notes himself that he relied on management's representations. Ponce does not challenge that he had an obligation to verify management's representations,[13] nor that not doing so falls below a level of due professional care that is required of him. He merely reiterates his challenge to the SEC's conclusion that he violated the anti-fraud provisions of the securities laws. This argument fails to relieve him of liability for a violation of the Rules of Practice because SEC's findings are supported by substantial evidence and are not arbitrary or capricious.

Furthermore, the SEC has shown that due professional care requires that accountants test management's representations about their finances. Tersigni testified that Ponce's practice of relying on management's representations in performing his audits violated GAAS. Instead, Ponce should have conducted independent tests to determine whether AAC's representations were accurate, and whether those things that management was instructing him to do were in conformity with GAAP. Had Ponce done so, Tersigni testified, he would have realized that the tooling and prototype costs should have been expensed, pursuant to FAS 2. As such, the SEC's finding that Ponce's fail-

ure to test AAC's representations constituted improper professional conduct in violation of Rule 102(e)(iii) is not in error.

The evidence in the record regarding Ponce's outstanding fees is similarly disturbing and compelling. Ponce admits that in 1989 AAC owed him $17,769 and by 1991 the amount owed reached $65,000. However, Ponce argues that the SEC has not established that the unpaid fees AAC owed him were so material as to affect his independence as an auditor. However, the relevant professional standards regarding fees create a presumption of impairment of an auditor's independence if "[d]uring the period of a professional engagement or at the time of expressing an opinion, a member or a member's firm [h]ad or was committed to acquire any direct or material indirect financial interest in the enterprise." CODE OF PROFESSIONAL CONDUCT, § 101.02(A)(1) (American Inst. of Certified Pub. Accountants 1990). Ponce failed to provide any evidence to rebut this presumption.

Similarly, § 191.104 of the Code of Professional Conduct also provides:

> At the time a member issues a report on a client's financial statements, the client should not be indebted to the member for more than one year's fees. Accordingly, unless the amounts involved are clearly insignificant to both the client and the member, independence is considered to be impaired if fees for all professional services rendered for prior years are not collected before the issuance of the member's report for the current year.[14]

*Id.* at § 191.104. There is no evidence that the fees Ponce was owed were "clearly

---

**13.** CODIFICATION OF STATEMENTS ON AUDITING STANDARDS, *Statement on Auditing Standards No. 1*, § 333.02 (American Inst. of Certified Pub. Accountants 1989) reads: "[R]epresentations from management are part of the evidential matter the independent auditor obtains, but

they are not a substitute for the application of *those auditing procedures necessary to afford a reasonable basis for his opinion on the financial statements.*"

**14.** In 1991, this section of the Code of Professional Conduct was replaced by the following:

insignificant" to either himself or AAC. The evidence of AAC's bleak financial status and the fact of its eventual demise also leads us to believe the SEC's case against Ponce was substantial. In fact, Ponce himself testified that "it [was] difficult to say" whether or not the fees that were owed to him affected his judgment. Ponce was well aware of his profession's independence requirements, since the record reflects that Ponce told Moody that his outstanding fees could jeopardize the validity of AAC's financial statements. Due to this danger, AAC and Ponce entered into a payment agreement in 1991, but by this time the audits for the prior year were already tainted.[15]

In sum, Ponce did not show that the SEC's decision was not supported by substantial evidence or that the SEC's conclusion that he violated Rules of Practice 102(e)(1)(ii) and (iii) was arbitrary, capricious or otherwise not in accordance with the law. Accordingly, the SEC was authorized pursuant to Rule 102(e)(1) to suspend Ponce from practicing before the Commission.

D. *The cease and desist order and Ponce's permanent bar*

■ Lastly, Ponce contests the propriety of the permanent bar that the SEC imposed on him, as well as the cease and desist order that it issued against him. We uphold both sanctions, having already upheld the SEC's underlying factual findings that form the basis of the sanctions.

We review the SEC's imposition of sanctions for an abuse of discretion. *Sorrell,* 679 F.2d at 1327. Moreover, our circuit has stated that "[b]ecause 'the relation of remedy to policy is peculiarly a matter for administrative competence,' we will not disturb SEC sanctions unless they are unwarranted in law or without justification in fact." *Hinkle Northwest, Inc. v. SEC,* 641 F.2d 1304, 1310 (9th Cir.1981) (citation omitted); *see also Vernazza v. SEC,* 327 F.3d 851, 862 (9th Cir.2003) ("We will find a Commission sanction to be an abuse of discretion only if we find that such a sanction is unreasonable or that it is unwarranted in law or without justification in fact.") (internal quotation marks and citations omitted).

The SEC did not abuse its discretion by entering a cease and desist order against Ponce. Section 21C of the Exchange Act authorizes the SEC to issue a cease and desist order to any person that "is violating, has violated, or is about to violate any provision of this chapter, or any rule or

---

Independence of the member's firm is considered to be impaired if, when the report on the client's current year is issued, fees remain unpaid, whether billed or unbilled, for professional services provided more than one year prior to the date of the report. Such amounts assume the characteristics of a loan within the meaning of Rule 101 and its interpretations.

This ruling does not apply to fees outstanding from a client in bankruptcy.

CODE OF PROFESSIONAL CONDUCT, § 191.104 (American Inst. of Certified Pub. Accountants 1991).

15. The SEC also asserts that the payment arrangement that Ponce and Moody entered into itself constituted improper professional conduct because Ponce's unpaid fees were to be paid by AAC stock, which gave him a direct financial interest in AAC, in violation of § 101.02(A)(1) of AICPA's Code of Professional Conduct. CODE OF PROFESSIONAL CONDUCT, § 101.02(A)(1) (American Inst. of Certified Pub. Accountants 1990). Although we find the evidence regarding Ponce's outstanding fees sufficient to support the SEC's finding that Ponce's independence was compromised, the record also supports the SEC's finding that the payment agreement also presumptively compromised Ponce's independence at least with respect to the 1991 audit because he held an interest in AAC's stock at the time he conducted it.

regulation thereunder." 15 U.S.C. § 78u–3 (1996). The SEC issued a cease and desist order against Ponce because it found that Ponce violated the anti-fraud, record keeping, and reporting requirements of the federal securities laws. Ponce does not provide us with any grounds for setting aside the cease and desist order, aside from launching a general challenge to the evidentiary basis of the securities laws he was found to have violated. Because we are upholding the SEC's determination that Ponce violated these laws, we reject Ponce's argument to this effect.

■ Similarly, the SEC's imposition of a permanent bar [16] against Ponce is proper. The SEC's authority to impose such a bar arises under both Section 21C of the Exchange Act, as well as Rule 102(e)(1) of the SEC Rules of Practice. Ponce has not advanced any novel arguments as to why the SEC's chosen sanction is improper. Because we hold that both the SEC's findings that Ponce violated federal securities laws, as well as SEC Rules of Practice, are supported by substantial evidence and are not arbitrary or capricious, the SEC's sanction of permanently barring · Ponce from appearing before the Commission is likewise proper.

Although the permanence of the bar can be seen as harsh, it is not our decision to make at this level of review. Our inquiry is necessarily limited to assessing whether the SEC abused its discretion in imposing such a sanction. *See Vernazza*, 327 F.3d at 858 ("Our task is to assure that the sanction is supported by the law and facts, not to revisit the sanction anew or impose our independent judgment on the merits of the sanction."). In doing so, we note that the conduct underlying Ponce's violations of both the laws and the Rules of Practice

spanned the course of four years, and there is no evidence that Ponce would have ceased to engage in such behavior, as demonstrated by his breach of the Rules of Practice as late as 1990, were it not for AAC's demise. It was rational for the SEC to conclude that Ponce could persist in violating federal securities laws, perhaps no longer in his duties for AAC, but possibly on behalf of another company. It is within the SEC's province to make such a judgment call and utilize Section 21C as a preventative measure. *See KMPG, LLP v. SEC*, 289 F.3d 109, 122 (D.C.Cir.2002) ("Section 21C authorizes the entry of a cease-and-desist order to prohibit '*any* future violation of the same provision' found to have been violated in the instant case.' ") (quoting 15 U.S.C. § 78u–3) (emphasis in original).

In sum, the SEC did not abuse its discretion in fashioning its cease and desist order, and permanent bar, against Ponce.

## III

For the foregoing reasons, we hold that there is substantial evidence to uphold the SEC's decision that Ponce violated the anti-fraud provisions of the federal securities laws, aided and abetted AAC's violation of the reporting and record keeping requirements, and violated SEC Rules of Practice. The SEC's findings that Ponce violated Exchange Act Section 10(b), 13(a) and 13(b)(2) and accompanying regulations were supported by substantial evidence such that a reasonable mind would accept its conclusion. In addition, there is ample evidence that Ponce also engaged in improper professional conduct, in contravention of SEC Rule of Practice 102(e)(1)(ii). Moreover, the SEC's conclusions were not arbitrary, capricious, nor otherwise not in accordance with law. The decision of the

---

16. Ponce retained the right to re-apply to practice before the Commission in five years.

SEC is therefore **AFFIRMED** and the petition for review is **DENIED**.