Raul NAVARRO, Doris Navarro, Virgina B. Abney, Alabama Coushatta Tribe of Texas (A Federally Recognized Indian Tribe), Amarillo Financial Freedom I, LP, Amarillo Financial Freedom, Inc., Americo Acosta, Marquita Adamson, John H. and Dorothy P. Alexander, Raquel Avalos, John G. Alvarado, James R. Bailey, Bill J. and Betty L. Barker, Billy Barnes, Harvey A. and Babara S. Baycroft, Charles L. and Margaret D. Bechtold, Deborah A. Bench, John Black, Vanala Boles, Phyllis M. Breedlove, Richard L. and Linda Briggs, David and Deena Brown, Francis Austin Brown as Trustee of the Mobley Family Trust, Nathan Eugene Bruton, Guy H. and Robyn F. Burkhart, A.E. Gene, Mary Cade, Doris B. Cain, Joyce Cain, Vinous W. and Dorothy Cantrell, Cathy Gandy Capuano, Robert M. Castle, Jr., Darlene Meader Riggs f/k/a Darlene M. Cates, Thelda A Chambliss, Bobbye Chamlee, Patricia M. Chandler, John P. Chirafis, Jr., Ennis and Mattie Cole, Laverne Connally, Margaret Cramer, Lavilla Craven, Ronald Crow, Lori Cummings, William M. Daniels, Joyce Dawson, Kathleen Deaver, Gary and Donna Dockall, Sixta De Gomez, Magda De Quiroga, Frances R. and Wanda Delulio, Don and Cletha Dickerson, Peggy Dockstader, Iva Doherty, Bernette L. and Steven B. Dong, Isabell Dorries, Mary Alice Duckett, Kenneth Dugger, Herbert Eastwood, Harlan H. Enyeart Faldmo Family Limited Partnership, Eddie Farrell, Oleta Farrell, Carolyn Fife, Anna Flippin, Kathryn Fisher, Florence France, William M. Francis, Carl and Stella Freeman, Aide O. Garcia, Betty J. Granger, Ada Ruth Green, as Executor of the Estate of Mabel Ellis, Susan Green, Geraldine Greer, Gera, Ltd., Florence Gibson a/k/a Jo Gibson, Billy Hahn, Anita Harper, Jim Hanna, Sylvia Harlan, Haskin Family Trust, T.W. Harrison, Raymond Hebert, Melba R. Held, Kathleen and Aquileo Hernandez, Robert Herrin, Josie Herrin, Austin Stanley, Sue Hickman, Howard R. and Ruby L. Hill, Jimmy L. and Wanda J. Hill, Bruce Hopewell, Charles Horn, Brenda Howard, William and Nita Hrach, R.L. Huguley, T.J. Hull, Martha Ibanez, Claude Jinks, David Jiron, as Representative of the Estate of Bayardo Jiron, Robert E. Johnson, Ralph and Elsie Joseph, Charles H. Jones, Rodney and Patricia A. Keng, Norma Kittrell, Louis E. Krantz, III, S.A. Kuse, Linda and Dan W. Lakenmacher, Phillip W. Lawson, Queen Anne Lawson, Shirley Leatherwood, Phyllis Lee, Lynn Lemon, El Nora Lobstein, Helen B. Lucio, Mark Mahula, Gertrude S. Marsh, Agnes S. Martin, Robert and June Martin, W.H. Mason, Leon and Luz Amelia McClellan, Burnett McCloud, Thomas McClung, Joyce McCormick, John J. McEwen, Joe and Liilie McGowan, James and Lela Meader, Glen and Marilyn Michal, Mike and Terry Miller, Maurice J. and Dorine Moeller as Trustees of the Maurice J. and Dorine Moeller Revocable Living Trust, Maurice J. Moeller, Individually, Robert S. Montgomery, James A. Morgan, Charles E. and Ann E. Morisey, Arnis Morris, Oleain Morris, Earl Morse, Tommie Murillo, Robert Murphy, Foy C. Nelson, Corydon O. Nichols, Paulette Everette Norman, Doyle Norris, Walter O. and Madeleine Novelly, William Nugent, Gerald Pace, Kenneth C. Parsons, Pamela Schultz Parsons, John H. Persefield, Marilyn Ploch, Morris Palumbo, Connie L. Recer, Danny Reed, Samuel and Nacy Reile,

Richard Reynolds, Ronald Richardson, Rene and Todd Riedlinger, Victor Rios, Curtis Roberts, Charles Rodgers, Terry Rozell, C.A. Salazar, Gentil Salazar, Verline Schulte, George Schultz, Vivian Scott, Fermin Scroggins as Trustee of the Scroggins Family Revocable Living Trust, Alan B. Sherman, Alberta Singer, Crispin and Matthew Smith, Eugene Smith, Robert M. Sprague, Gertrude Stansell, Margaret A. Sterling, Norma J. Stewart, Stow Family Trust, John S. and Waltraud E. Swaim, Zelma Thorn, Lonnie L. Todd, Diana A. Trevino, Charles Ray and Karen Turley as Trustees of the Turley Revocable Living Trust, Chessa Vines, Edna Voelker, Kathy S. and Jimmy L. Vowell, Michael Wikman, J.C. Williamson, Terry Winchester, Judy Woodfin, Joel and Linda Worley, and Mary Elizabeth Young, Appellants

v.

GRANT THORNTON, LLP, Appellee.

No. 14–08–00482–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 29, 2010.

Andrew J. Mytelka, Galveston, Micky N. Das, James H. Miller, Houston, John A. Buckley Jr., Galveston, for appellants.

Christina Espinosa Rodriguez, Stephen G. Tipps, Philip J. John Jr., Michael Shane Kimzey, Houston, for appellee.

Panel consists of Justices YATES, FROST, and BROWN.

## OPINION

KEM THOMPSON FROST, Justice.

This is an appeal of a summary judgment dismissing claims against an accounting firm for aiding and abetting primary violations of the Texas Securities Act. Our main task on appeal is to determine if a fact issue exists as to whether the accounting firm rendered substantial assistance in these primary violations. Concluding that there is no genuine issue of material fact as to substantial assistance and that the accounting firm is entitled to judgment as a matter of law, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

In 2005, Charles Edwards was convicted in a federal court in Georgia of 83 counts of wire fraud, money laundering, and conspiracy relating to his running of a Ponzi scheme that resulted in significant losses to many investors. Edwards was the sole shareholder of ETS Payphones, Inc. ("ETS"). ETS's business model was based on a program for the sale and lease-back of customer-owned, coin-operated telephones ("Payphones"). ETS used distributors to sell Payphones to individuals. After locating a person interested in buying a Payphone, a distributor would sell the Payphone to the buyer for a price of between $6,000 and $7,000, immediately after the distributor bought the Payphone from ETS for a lower price. The buyer would then lease the Payphone back to ETS, with ETS agreeing to make monthly lease payments to the buyer for 60 months. ETS would agree to buy the Payphone back from the buyer for the original purchase price within 180 days of the buyer requesting a buyback. At the end of the 60 month lease, the buyer had several options, one of which was selling the Payphone back to ETS for the original purchase price. In general, the Payphones generated less money than the monthly lease payments that ETS made to the lessors. ETS made profits on the original sales of the Payphones. ETS used the profits from new sales to pay its obligations to the existing lessors.

Phoenix Telecom, Inc. ("Phoenix") employed a substantially similar business model. Though Edwards did not own Phoenix or work for Phoenix, Edwards advised Phoenix on how to enter the Payphone business, and Phoenix had an oral agreement with Edwards to pay him $100 for each Payphone Phoenix sold. In July 2000, Phoenix was no longer able to make its monthly lease payments, and Phoenix attempted to transfer its operations to

---

1. The record is voluminous, and the factual and procedural history complex. We mention only the factual and procedural background relevant to the issues presented in this appeal.

ETS. Phoenix informed its lessors of an offer for them to terminate their leases with Phoenix and sign new five-year leases with ETS. In August 2000, a receiver was appointed for Phoenix, and Phoenix's assets were frozen. That same month, the Securities and Exchange Commission ("SEC") filed a civil enforcement action against Phoenix and others, and in September 2000, ETS filed for bankruptcy protection.

Appellants/plaintiffs are approximately 224 Texas residents who participated in the purchase-and-leaseback program of either ETS or Phoenix ("Lessors"). Appellee/defendant Grant Thornton, LLP ("Grant Thornton") is an accounting firm retained by ETS and Phoenix to perform services. The Lessors sued Grant Thornton asserting various tort claims, including the following: (1) claims under the Texas Securities Act ("Securities Act") for aiding and abetting ETS or Phoenix in violating article 581–33(A)(1) of the Securities Act through the sale of unregistered securities, (2) claims under the Securities Act for aiding and abetting ETS or Phoenix in violating article 581–33(A)(2) of the Securities Act through the sale of securities by means of untruths or omissions, (3) conspiracy to commit common law fraud, and (4) various claims by 39 specific Lessors (hereinafter the "39 Lessors"). *See* TEX. REV.CIV. STAT. ANN. art. 581–33 (Vernon Supp. 2010).

Grant Thornton filed several summary-judgment motions, asserting a variety of traditional and no-evidence grounds. The trial court signed a series of partial-summary-judgment orders that eventually yielded a final judgment in which the trial court disposed of all of the Lessors' claims by summary judgment.

## II. ISSUES PRESENTED

On appeal, the Lessors assert these three issues:

(1) Did the trial court err in granting summary judgment because there was a fact issue as to whether Grant Thornton aided and abetted ETS and Phoenix in their primary violations of the Securities Act? [2]

(2) Did the trial court err by granting summary judgment as to the Lessors' conspiracy-to-defraud claims based upon the two-year statute of limitations because the four-year statute of limitations applies to these claims?

(3) Did the trial court err in granting summary judgment as to the claims of the 39 Lessors?

## III. STANDARD OF REVIEW

In reviewing a no-evidence summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence raising a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08 (Tex.2002). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if rea-

---

**2.** In their first issue, the Lessors assert that the trial court erred in granting summary judgment because "legally and factually sufficient evidence shows Grant Thornton aided and abetted primary violations of the Texas Securities Act." However, in their argument, the Lessors state the standard for reviewing a trial court's summary judgment, and the Lessors have assigned error regarding the trial court's granting of summary judgment as to their aiding and abetting claims under the Securities Act. Liberally construing their opening brief, the Lessors assert that there was a fact issue precluding summary judgment as to the statutory aiding and abetting claims.

sonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex.2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007). We must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000).

## IV. ANALYSIS

### A. Does the two-year statute of limitations apply to the Lessors' conspiracy-to-defraud claims?

■ The trial court dismissed the Lessors' conspiracy-to-defraud claims after impliedly determining that the two-year statute of limitations barred these claims as a matter of law. In their second issue, the Lessors assert that the trial court erred in dismissing these claims because they are governed by the four-year statute of limitations rather than the two-year statute. The Lessors assert that conspiracy claims are governed by the statute of limitations that pertains to the underlying tort. Because their conspiracy-to-defraud claims are based on common-law fraud, which is governed by the four-year statute of limitations in section 16.004 of the Texas Civil Practice and Remedies Code, the Lessors argue that their conspiracy-to-defraud claims are governed by this four-year statute of limitations, rather than the two-year statute of limitations in section 16.003 of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 16.003, 16.004 (Vernon Supp. 2009, Vernon 2002). The Lessors cite no Texas case holding that section 16.004 applies to conspiracy-to-defraud claims. Research has revealed no Supreme Court of Texas case addressing which limitations period should be applied to conspiracy claims. However, in *Mayes v. Stewart,* this court determined that section 16.003 applies to conspiracy-to-defraud claims. *See* 11 S.W.3d 440, 453 (Tex.App.Houston [14th Dist.] 2000, pet. denied). The *Mayes* precedent is not contrary to any holding of the Supreme Court of Texas or of this court sitting en banc and there has been no intervening, material change in the statutory law since *Mayes.* Therefore, we are bound by the *Mayes* precedent to hold that the trial court correctly determined that section 16.003 applies to the Lessors' conspiracy-to-defraud claims. *See Chase Home Fin., L.L.C. v. Cal W. Reconveyance Corp.,* 309 S.W.3d 619, 630 (Tex.App.-Houston [14th Dist.] 2010, no pet.); *Mayes,* 11 S.W.3d at 453. Accordingly, we overrule the Lessors' second issue.

### B. Did the trial court err in granting summary judgment dismissing the claims of the 39 Lessors?

■ The trial court granted summary judgment as to the claims of the 39 Lessors without specifying the grounds upon which it relied. Therefore, on appeal, the 39 Lessors must show that each independent summary-judgment ground asserted against their claims does not provide a basis for affirming the trial court's summary judgment. *See Ramco Oil & Gas Ltd. v. Anglo–Dutch (Tenge) L.L.C.,* 207 S.W.3d 801, 826 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). On appeal, the 39 Lessors have attacked the two summary-judgment grounds contained in Grant Thornton's April 5, 2005 motion for summary judgment. However, the 39 Lessors have not attacked the grounds asserted against their claims in Grant Thornton's June 7, 2005 motion for sum-

mary judgment, which also served as a basis for the trial court's summary-judgment order of May 16, 2006.[3] Because the 39 Lessors have not challenged all of the independent summary-judgment grounds upon which the trial court granted summary judgment, we overrule the third issue and affirm the trial court's judgment as to the claims of the 39 Lessors. *See Bartee v. Baylor Coll. of Med.*, No. 14–06–00324–CV, 2007 WL 2989614, at *5 (Tex. App.-Houston [14th Dist.] Oct. 16, 2007, no pet.) (mem. op.).

## C. Did the trial court err in granting summary judgment as to the aiding and abetting claims under the Securities Act?

The Securities Act establishes both primary and secondary liability for securities violations. Primary liability arises in various circumstances, including when a person offers or sells an unregistered security in violation of the Securities Act and when a person offers or sells a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Tex.Rev.Civ. Stat. Ann. art. 581–33(A) (Vernon Supp. 2010). Secondary liability is derivative liability for another person's securities violation; it attaches

to an aider, defined as one "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.* art. 581–33(F)(2). Aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were" the primary violator. *Id.*

In their first issue, the Lessors assert that genuine fact issues preclude summary judgment as to (1) claims under the Securities Act for aiding and abetting ETS or Phoenix in violating article 581–33(A)(1) of the Securities Act through the sale of unregistered securities and (2) claims under the Securities Act for aiding and abetting ETS or Phoenix in violating article 581–33(A)(2) of the Securities Act through the sale of securities by means of untruths or omissions (hereinafter collectively "Aiding and Abetting Claims").[4]

To prevail on these claims, the Lessors must establish the following elements: (1) a primary violation of the Securities Act (a violation of either article 581–33(A)(1) or article 581–33(A)(2)); (2) Grant Thornton had general awareness of its role in this violation; (3) Grant Thornton rendered substantial assistance in this violation; and (4) Grant Thornton either (a) intended to deceive the Lessors or (b) acted with reckless disregard for the truth or the law.[5]

3. In this order, the trial court granted "the *motions* for summary judgment of Defendant Grant Thornton ... as to the following: ... All claims asserted by the 39 Plaintiffs identified in Defendant's Exhibit Y (with ETS leases)." (emphasis added).

4. Most of the remaining Lessors did not assert aiding and abetting claims regarding the sale of unregistered securities when the trial court granted summary judgment as to their claims; however, some of the remaining Lessors did assert such claims.

5. The Supreme Court of Texas has affirmed the "general awareness" requirement, hold-

ing that the Securities Act's "reckless disregard for the truth or the law" standard means that an alleged aider can be held liable only if it rendered assistance "in the face of a perceived risk" that its assistance would facilitate untruthful or illegal activity by the primary violator. *See Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 842 (Tex.2005). In order to perceive such a risk, the alleged aider must possess a " 'general awareness that his role was part of an overall activity that is improper.' " *See id.* (quoting *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 780 (3rd Cir.1976)).

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex.App.-Houston [14 Dist.] 2000, pet. denied).

### Analysis of Grant Thornton's Alleged Failure to Disclose Matters to Regulators and to the Lessors

As a threshold matter, we note that, in addition to relying upon evidence of various actions by Grant Thornton, the Lessors also assert that there was a genuine fact issue regarding substantial assistance based on Grant Thornton's failure to disclose the following matters to government regulators or to the Lessors:

- The Payphone sale/leaseback business model was a Ponzi scheme.

- The ETS/Phoenix businesses were Ponzi schemes.

- A relationship existed between Edwards, ETS, and Phoenix.

- Edwards was making money on each Payphone sale made by Phoenix.

- The Pennsylvania Securities Commission ("Pennsylvania Commission") was investigating both ETS and Phoenix.

- Phoenix and ETS were not competitors.

- Edwards was siphoning ETS investor funds into other corporations.

In their opening brief,[6] the Lessors make various references to Grant Thornton's failure to disclose these matters; however, the Lessors never assert that Grant Thornton had a duty to disclose these matters.[7] The Lessors assert that, if an alleged aider commits acts that further the primary violation of the Securities Act, then failures to disclose information can be considered in determining if the alleged aider rendered substantial assistance in the primary violation, regardless of whether the alleged aider had a duty to disclose.[8] The Lessors cite no cases addressing this issue under the Securities Act, and research has not revealed any. We conclude that, if an alleged aider under the Securities Act has no duty to disclose, then the alleged aider's failure to disclose cannot be considered in determining whether the alleged aider rendered substantial assistance in the primary violation

---

6. At one point in their reply brief, the Lessors assert that Grant Thornton "had a duty to disclose or withdraw." Even if this statement were timely, it is not an assertion that Grant Thornton had a duty to disclose because Grant Thornton could have satisfied this alleged duty by withdrawing. We address the alleged duty to withdraw below.

7. The Lessors' expert, D. Paul Regan, did not testify that Grant Thornton had a duty to disclose the above-listed items to regulators or to the Lessors. The Lessors cite the testimony of Stephen McEachern, Grant Thornton's expert. McEachern, however, testified that, if an accounting firm detects material fraud while doing a compilation and if that fraud has not been detected previously and accounted for, then the accounting firm would have a duty to inform the client but no duty to inform anyone other than the client.

8. The Lessors assert that the facts of the case at hand are similar to those in *Fund of Funds,*

*Limited v. Arthur Andersen & Company.* See 545 F.Supp. 1314 (S.D.N.Y.1982). The *Fund of Funds* case involved "highly unusual circumstances," in which mutual funds sued their own accounting firm for aiding and abetting a violation of section 10(b) and rule 10b–5 of the Securities Exchange Act by one of the accounting firm's other clients. *See id.* at 1354–59. The federal district court in *Fund of Funds* held that the accounting firm owed a duty to the mutual-fund clients whose financial statements it was auditing to determine whether the records fairly presented the funds' financial position and to disclose irregularities which the auditors happened upon. *See id.* at 1357. There is no evidence that Grant Thornton audited any financial statements for the Lessors. The *Fund of Funds* case involved an unusual fact pattern that is significantly different from the facts in the case under review.

of the Securities Act.[9]  *See Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553, 883 N.Y.S.2d 147, 910 N.E.2d 976, 981 (2009) (holding, under New York law, that investors' claims against hedge fund's lawyers for aiding and abetting fraud could not be based on lawyers' failure to disclose because lawyers had no duty to disclose); *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.,* 64 A.D.3d 472, 883 N.Y.S.2d 486, 489–90 (N.Y.App.Div.2009) (holding, under New York law, that claims against lead arrangers of company's refinancing for aiding and abetting fraud could not be based on arrangers' failure to disclose that the company was insolvent unless the arrangers had a duty to disclose this information to the plaintiffs).  Because the Lessors have not asserted or briefed an argument that Grant Thornton had a duty to disclose the items listed above to the regulators or to the Lessors, we do not consider Grant Thornton's alleged failure to disclose those matters to the regulators or to the Lessors in determining whether there is a fact issue as to substantial assistance.

██ As to the Lessors other than the 39 Lessors, the trial court granted summary judgment as to all of their Aiding and Abetting Claims based on the ground that there was no evidence that Grant Thornton rendered substantial assistance in the primary violations of the Securities Act by ETS or Phoenix.  The Lessors challenge this ruling on appeal and point to evidence of the following matters as raising a genuine fact issue regarding substantial assistance:

● Grant Thornton's Dallas office audited Phoenix's financial statements as of September 30, 1998, and December 31, 1998 but did not include a "going concern" paragraph in its audit reports expressing substantial doubt about Phoenix's ability to continue as a going concern for a reasonable period of time not to exceed one year beyond the date of the financial statement being audited (hereinafter "Going Concern Paragraph").  The Payphone leases were accounted for as capital leases, and the financial statements showed that Phoenix had a negative net worth of more than $4.7 million as of December 31, 1998, and an operating loss of more than $1 million during the period ending on December 31, 1998.  The Lessors cite Grant Thornton work papers stating (1) that because the lessors have a "put option," all of Phoenix's lease obligations have been classified as current liabilities;  (2) as disclosed in the notes to the financial statement, Phoenix is unable to pay this liability with its present resources;  (3) to date, there have not been a significant number of "puts" exercised by lessors, and Grant Thornton had no indication that this situation would change in the next year;  (4) Phoenix believed that it would be able to raise funds to pay the "puts" by reselling the Payphones;  (5) this was consistent

---

9.  The Lessors cite cases articulating a doctrine from federal securities law regarding aiding and abetting liability.  Under this doctrine, if an alleged aider has a duty to disclose the primary violation, recklessness is sufficient to establish scienter; however, even absent a duty to disclose, an alleged aider's failure to disclose can be considered in the substantial-assistance analysis if this failure to disclose was consciously intended to further the principal violation.  *See, e.g., SEC v. Tambone,* 550 F.3d 106, 144 (1st Cir.2008), *withdrawn,* 573 F.3d 54 (1st Cir.2009) (en banc), *reinstated in part,* 597 F.3d 436, 450 (1st Cir.2010) (en banc).  However, we conclude that this doctrine contradicts the unambiguous language of the Securities Act, under which "reckless disregard for the truth or law" is sufficient scienter for all aider claims.  *See* Tex.Rev.Civ. Stat. Ann art. 581–33(F)(2); *Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 837 (Tex.2005).

with Grant Thornton's observation that Phoenix has more difficulty in finding Payphones to buy than it had in finding buyers for Payphones; (6) this was also consistent with the dynamics of the Payphone industry cited in a report on this industry by Hoak, Breedlove, Wesneski & Company; and (7) Grant Thornton concluded that there was not substantial doubt regarding the continued existence of Phoenix.

• The Lessors' accounting expert, D. Paul Regan, testified that "there was substantial doubt as to Phoenix's ability to realize its assets or liquidate its liabilities in the ordinary course of its operations." In Regan's opinion, Grant Thornton should have included a Going Concern Paragraph in its report on Phoenix's audited financial statements as of September 30, 1998, and December 31, 1998 because: (1) There were significant "impairments of assets" which required Phoenix to have impairment reserves, yet Phoenix included these assets in its balance sheet with no impairment reserve; (2) Phoenix's ability to "realize its assets" and liquidate its liabilities in the ordinary course of its operations was in substantial doubt; (3) Phoenix's current assets totaled $5.2 million, while its current liabilities totaled $19.1 million; (4) Phoenix's "Member's Equity" was reported at a deficit of $4.8 million, even before the reduction for required impairment reserves; and (5) Grant Thornton noted that Phoenix did not have the resources to satisfy its obligations under capital leases totaling $18.7 million.

• Grant Thornton's Atlanta office compiled financial statements for ETS as of March 31, 1999, in accordance with Generally Accepted Accounting Principles ("GAAP"), and these statements treated the leases as capital leases ("ETS GAAP Statements"). In its report of these compiled financial statements, Grant Thornton stated that "a compilation is limited to presenting in the form of financial statements information that is the representation of management. [Grant Thornton has] not audited or reviewed the accompanying financial statements and, accordingly, [Grant Thornton does] not express an opinion or any other form of assurance on them."

• Grant Thornton's Atlanta office also compiled financial statements for ETS as of March 31, 1999, that were not in accordance with GAAP, and these statements treated the leases as operating leases ("ETS Non–GAAP Statements"). In its compilation report for the ETS Non–GAAP Statements, Grant Thornton stated on the first page that the financial statements are not in accordance with GAAP and explained the departures from GAAP in the ETS Non–GAAP Statements and how these items should be accounted for under GAAP. Grant Thornton also stated that "users of these financial statements should recognize that they might reach different conclusions about the Company's financial position, results of operations, and cash flows if they had access to revised financial statements prepared in conformity with [GAAP]."

• Grant Thornton did not include a Going Concern Paragraph in the notes to either of these financial statements. The ETS GAAP Statements showed that ETS had operating losses in excess of $32 million for the 15–month period ending on March 31, 1999, and that ETS had a negative "accumulated deficit" on March 31, 1999 in excess of $24 million. The ETS Non–GAAP Statements showed that ETS had operating income in excess of $3.5 million for the 15–month period ending on March 31, 1999, and that ETS had retained earnings on March 31, 1999 in excess of $3.7 million.

- Both the ETS GAAP Statements and the ETS Non–GAAP Statements were included in a rescission-offer letter that ETS sent to Pennsylvania residents who had bought Payphones and leased them back to ETS. These letters offering rescission to Pennsylvania lessors were sent in November 1999, under an agreement between ETS and the Pennsylvania Commission. The letters explained the differences between the ETS GAAP Statements and the ETS Non–GAAP Statements.

- In the notes to the ETS GAAP Statements, Grant Thornton stated that "The Company's management believes that the operating loss and accumulated deficit do not reflect an inability of the Company to continue as a going concern. Management believes that the historically low rate of investors exercising their 'put' option indicates a high degree of lessor satisfaction. Management does not foresee any dramatic change in the amount of put options that will be exercised in the future."

- Mario Commito, who was ETS's Chief Financial Officer when it retained Grant Thornton's services, testified that (1) Charles Edwards indicated to Commito that he wanted to have ETS's financials audited and asked Commito to find a new accounting firm to perform the audit; (2) Commito contacted Andre Schnabl of Grant Thornton and "explained to him that we were looking to have a certified audit"; (3) Edwards wanted a certified audit done; and (4) Grant Thornton had to do a preliminary review to define issues relating to the preparation of audited financials so that they could present a quote to ETS as to how much an audit would cost. Edwards testified that ETS originally hired Grant Thornton because Schnabl "thought he could get [ ETS] an audited statement with operational leases." According to

Edwards, after Schnabl "ran it upstream, they would not allow him to do it." In his billing entries, Schnabl described 6 hours of work that he performed for ETS as "audit." Another Grant Thornton employee described 30 hours of work performed for ETS as "audit."

- In April 1999, Commito faxed Schnabl a draft of a letter composed by Carl Schneider (a Pennsylvania lawyer working for ETS) to the Pennsylvania Commission seeking to respond to the Pennsylvania Commission's concerns that ETS had been selling unregistered securities in Pennsylvania in violation of Pennsylvania securities laws. In the draft letter, ETS's lawyer states that ETS will prepare unaudited financial statements for the year ended December 31, 1998, treating its leases as capital leases. According to the draft letter, though Grant Thornton will not be auditing these financial statements, Grant Thornton will advise ETS and "will be prepared to advise [the Pennsylvania Commission](1) that the basis of presentation in these financial statements conforms with GAAP, and (2) if [ETS] uses the same presentation in its financial statements for its new fiscal year end of March 31, 1999, Grant Thornton will be prepared to issue an audit opinion that the March 31, 1999, financial statements conform with GAAP, without any qualification regarding the basis of the presentation." Apparently referring to this part of the draft letter, Commito told Schnabl, "I really appreciate your commitment to a clean opinion on our 3/31/99 F/S." There is no evidence of any response from Schnabl to Commito's statement.

- In a memo sent to individuals at ETS and Grant Thornton, Schneider stated that: (1) in August 1998, ETS and the

Pennsylvania Commission had an understanding that a rescission offer would be sent to Pennsylvania lessors within thirty days; (2) fourteen months had passed as of October 1999, and ETS had not yet made the offer; and (3) the Pennsylvania Commission realizes that much of the delay was caused by the delay in producing financial statements.

- In a handwritten note in Grant Thornton's files, the unknown author of the note states, "Andre refers to 'synthetic' & 'virtual synthetic' leases."

- On February 2, 2000, in an investigative interview before the SEC regarding Phoenix, George Banks of Grant Thornton was asked whether he agreed that Phoenix was in "a pretty tough financial situation," given that it had current assets of less than $5.3 million and current liabilities of $19 million. Banks replied, "Well, I would agree that one could develop that conclusion, but quite frankly in my view it's not nearly as bad as it looks. We ... have a case of the financial statements being—because of the oddities of [GAAP] you're seeing a picture here that probably is much worse than it is." Banks further explained that $18 million of the liabilities were from five-year leases that were considered current liabilities because of the ability of the lessors to exercise a put-option on 180 days' notice. However, Banks stated that based on all the evidence Grant Thornton had, in Grant Thornton's view, the likelihood of the current liabilities having to be paid in the next year was remote.

- On April 26, 2000, in a hearing before the SEC regarding ETS, Andre Schnabl of Grant Thornton was asked whether ETS had to keep selling Payphones to meet its obligations. Schnabl responded, "I am not sure that I can be that definitive because I am unclear as to the rate of appreciation because the company has the option also to sell, just as they have bought lots of payphones they can sell lots of payphones and then I am not sure as to the market for that. The secondary market for buying large inventory of located revenue-generating phones is but, [sic] clearly, if the rates [sic] of appreciation is lower than the cost of capital inevitably gross becomes critical to survival." When asked if he was saying that ETS had to keep selling more and more Payphones, Schnabl responded "That is based on the assumption that gross is lower than the cost of capital and I do not know that."

- In February 1999, for the purposes of consideration and discussion by ETS's management, Grant Thornton proposed various possibilities for restructuring ETS. The stated purposes of the restructuring under consideration were (1) to provide an operating structure for ETS that would increase the likelihood of ETS becoming a public company, (2) to allow Edwards to control the Payphones leased by ETS for the benefit of Edwards and his family, and (3) to obtain estate tax savings for Edwards.

- An October 26, 1999 memo from Schneider (ETS's Pennsylvania lawyer) indicates that, in October 1999, ETS was considering a proposal to restructure the company in a way that would purportedly remove approximately $164 million in liabilities from ETS's GAAP balance sheet and that this restructuring could be given retroactive effect and reflected on the financial statements to be included in the Pennsylvania rescission offer. The financials sent out with the Pennsylvania rescission offer did not reflect such a restructuring, and there is no evidence that such a restructuring ever occurred.

There is no summary-judgment evidence that raises a genuine issue of fact regard-

ing the following assertions by the Lessors:

- Grant Thornton stalled the Pennsylvania Commission's investigation by not timely producing its work product regarding the ETS financial statements.

- Grant Thornton attempted "to avoid securities laws" by suggesting that the Payphone leases be re-named as "synthetic & virtual synthetic leases."

- Grant Thornton "improperly put its stamp of approval on the ETS/Phoenix Ponzi scheme" by issuing its compilation reports for ETS or its reports on Phoenix's audited financial statements.

- Grant Thornton partners George Banks and Andre Schnabl gave SEC testimony defending ETS and Phoenix that delayed a cease and desist order and allowed months of continued sales to new investors (through July 2000 for Phoenix and through September 2000 for ETS).

- Grant Thornton aided corporate restructuring to siphon money from ETS, alter the appearance of the financial statement, and set up special purpose entities to help Edwards's goal of owning all the Payphones.

- If Grant Thornton began audit work for ETS, then Grant Thornton had a duty to continue and complete the audit and to ensure that ETS's audited financial statements complied with accounting standards.[10]

In addition, there is no evidence of any of the following:

- that Grant Thornton had any interaction with the Lessors or any involvement in the purchase-and-leaseback transaction with the Lessors;

- that the Lessors heard about Grant Thornton from the individuals who solicited them and who sold them the Payphones;

- that the Lessors received or reviewed the ETS GAAP Statements or the ETS Non–GAAP Statements compiled by Grant Thornton;[11]

- that any of the Lessors received or reviewed the Phoenix financial statements audited by Grant Thornton in deciding to enter into the Payphone purchase-and-leaseback transaction with Phoenix;

10. The Lessors make this assertion without providing any citation. Regan, the Lessors' expert, did not testify that such a duty exists. In another part of their opening brief, the Lessors suggest that McEachern, Grant Thornton's expert, testified to such a duty. The Lessors cite an isolated statement from McEachern's deposition, in which he states, "[b]ut if you are asked to report on the financial statements after you have done audit work, then I think the standards say that you should report at the highest level that you've performed work at [audit standards]." Even ignoring all contrary testimony from this deposition, McEachem did not testify to the existence of any duty; rather, he testified to what he thought the standards say. McEachem apparently was referring to paragraph 5 of the Statements on Standards for Accounting and Review Services 1 (Section 100.05), which the record reveals states, "when the accountant performs more than one service (for example, a compilation and an audit), he should issue the report that is appropriate for the highest level of service rendered." The record reflects that the staff of the American Institute of Certified Public Accountants's Accounting and Review Services Committee has published an interpretation of this section, in which the staff states that this section "imposes no requirement for the accountant to 'upgrade' his report because he has performed other accounting services." In addition, sections 100.44 to 100.49 make it clear that simply beginning some audit work does not trigger a duty to complete an audit and issue an audit report.

11. ETS sent the rescission offers with the compilation reports from Grant Thornton to the Pennsylvania lessors, not to the Lessors, who are Texas residents.

- that ETS ever restructured or reorganized based on the models or proposals suggested by Grant Thornton; or
- that Grant Thornton ever advised the Pennsylvania Commission that it was prepared to issue an "audit opinion" like that described in the April 1999 letter drafted by Schneider or that Grant Thornton issued such an opinion.

After carefully considering all the summary-judgment evidence in the light most favorable to the Lessors, crediting evidence favorable to the Lessors if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not, we conclude that no reasonable juror could find that Grant Thornton rendered substantial assistance in the primary violations of the Securities Act by ETS or Phoenix.[12]  See generally Crescendo Invs., Inc. v. Brice, 61 S.W.3d 465, 472–73 (Tex. App.-San Antonio 2001, pet. denied) (holding as a matter of law that defendants did not substantially assist in the primary violations of the Securities Act).[13]  The Lessors also assert that Grant Thornton breached a duty to withdraw from its representation of ETS and Phoenix after it allegedly discovered the fraud by these companies.  We presume for the sake of argument that Grant Thornton had such a duty to withdraw and breached this duty.

Even under this presumption, Grant Thornton's failure to withdraw resulted only in the completion by Grant Thornton of the actions reflected in the evidence that we already have determined do not constitute substantial assistance as a matter of law.  Therefore, any alleged breach by Grant Thornton of a duty to withdraw does not alter the conclusion of our analysis.

The Lessors rely on an opinion from the Third Court of Appeals.  See Goldstein v. Mortenson, 113 S.W.3d 769, 777 (Tex.App.-Austin 2003, no pet.).  In that case, the trial court rendered judgment against defendant Goldstein for more than $36 million in actual damages based on findings that he was liable under each of the following claims: (1) primary violations of the Securities Act, (2) aiding and abetting primary violations of the Securities Act, (3) fraud, and (4) conspiracy to defraud the plaintiff investors.  See id. at 774–75.  After adding more than $15 million for usury violations, $200 million in punitive damages, and prejudgment interest, the trial court rendered judgment against Goldstein for an amount in excess of $264 million.  See id. at 775.  The court of appeals concluded that the evidence was legally insufficient to support recovery against Goldstein based on the usury violations, the primary violations of the Securities Act,

12.  The Lessors assert that we should consider five factors from a comment to section 876 of the Restatement (Second) of Torts in determining whether a fact issue exists as to substantial assistance.  See RESTATEMENT (SECOND) TORTS § 876 cmt. d (1977).  Research has revealed no Texas case that applies these factors in analyzing substantial assistance in an aider claim under the Securities Act, and the Supreme Court of Texas has stated that it is an "open question" whether section 876 of the Restatement will be adopted in Texas.  See Juhl v. Airington, 936 S.W.2d 640, 643 (Tex.1996).  In any event, even if we were to apply these factors in our analysis, our conclusion would not change.  Therefore, we

need not and do not address whether these factors apply.

13.  In the Crescendo Investments case, a sister court of appeals concluded that there was no substantial assistance as a matter of law.  See Crescendo Invs., Inc., 61 S.W.3d at 472–73.  Though some analogies can be made to the facts of this case, the facts in Crescendo Investments were not the same or substantially similar to those in this appeal.  Indeed, research has revealed no case with the same or substantially similar facts in the context of a determination as to whether there is a fact issue as to substantial assistance.

and the claim that Goldstein committed fraud. *See id.* at 776–82. The court concluded that the evidence was sufficient to support the finding that Goldstein conspired to defraud the investors and that Goldstein's vicarious liability for fraud satisfied the predicate for punitive damages. *See id.* at 779–82. After reducing the punitive damages award to $73.2 million based on the punitive damages cap, the court of appeals affirmed a judgment of more than $121 million in favor of the plaintiffs. *See id.* at 783.

Though not necessary to the court of appeals's judgment, the *Goldstein* court addressed the aiding and abetting theory of recovery, concluding that the evidence was sufficient to support the "general awareness" and "reckless disregard" findings. *See id.* The *Goldstein* court briefly stated that there was sufficient evidence of substantial assistance based on Goldstein's "arranging" of an $8.6 million loan for the primary violator. *See id.* The court concluded that this assistance was substantial because it "enabl[ed] [the primary violator] to continue to operate, as well as to delay the Securities Board's discovery of wrongdoing." *Id.* at 777. The *Goldstein* court reached this conclusion even though it conceded that there was no evidence that the loan was ever funded or that the primary violator received any money as a result of the proposed loan. *See id.* at 776–77 & n. 8. The Supreme Court of Texas subsequently disapproved of the *Goldstein* court's analysis regarding "general awareness" and "reckless disregard," concluding that the *Goldstein* court's low threshold for these elements contradicted the requirements of the Securities Act. *See Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 841–43 (Tex.2005). We choose not to follow the *Goldstein* court's obiter dicta regarding substantial assistance.[14]

The summary-judgment evidence does not raise a genuine fact issue regarding the essential element of substantial assistance, and Grant Thornton was entitled to judgment as a matter of law based on its no-evidence ground challenging this element.[15] Therefore, the trial court did not err in granting summary judgment as to all Aiding and Abetting Claims asserted by the Lessors other than the 39 Lessors.[16] Accordingly, we overrule the first issue.

## V. CONCLUSION

Under binding precedent from this court, the trial court correctly determined

---

**14.** The Lessors also cite *Ponce v. SEC. See* 345 F.3d 722 (9th Cir.2003). The *Ponce* case did not involve a private action for damages; instead, the *Ponce* court reviewed an SEC administrative order sanctioning an accountant practicing before the SEC. *See id.* at 740–41. In *Ponce,* the primary violation was based on filing audited financial statements with the SEC, which the accountant prepared and certified. *See id.* at 734–38. The facts in *Ponce* are substantially different from those in this appeal.

**15.** We do not address whether there is a fact issue as to Grant Thornton's general awareness of its alleged role in the Securities Act violations or whether Grant Thornton (a) intended to deceive the Lessors or (b) acted with reckless disregard for the truth or the law. We have not discussed evidence rele-

vant only to Grant Thornton's awareness, scienter, or state of mind, and not relevant to whether Grant Thornton rendered substantial assistance in the primary violations of the Securities Act by ETS or Phoenix.

**16.** The Lessors rely on *First Federal Savings and Loan Association v. Oppenheim, Appel, Dixon & Co. See* 629 F.Supp. 427, 44243 (S.D.N.Y.1986). In that case, the court held that the complaint stated a claim against an accounting firm for aiding and abetting a federal securities violation based on allegations that the firm knew of the primary violation and that the firm sent to the investors audit-confirmation letters containing misrepresentations regarding facts related to the primary violation. *See id.* This case is not on point.

that the two-year statute of limitations from section 16.003 of the Texas Civil Practice and Remedies Code applies to the Lessors' conspiracy-to-defraud claims. The 39 Lessors have not shown that the trial court erred in granting summary judgment as to their claims because they have not challenged all of the independent summary-judgment grounds upon which the trial court relied in dismissing their claims. The trial court did not err in determining that the summary-judgment evidence did not raise a genuine issue of material fact as to whether Grant Thornton rendered substantial assistance in the primary violations of the Securities Act by ETS or Phoenix, as alleged in support of the Aiding and Abetting Claims. Nor did the trial court err in granting summary judgment as to the Aiding and Abetting Claims. Accordingly, we affirm the trial court's judgment.